Opinion for the Court filed by Circuit Judge SENTELLE.
Concurring opinion filed by Circuit Judge RANDOLPH.
Dissenting opinion filed by Circuit Judge ROGERS.
SENTELLE, Circuit Judge:
Each of the appellants, Jose Delgado-Garda, Jose Prado-Morales, and César BravoCeneño, pleaded guilty either to conspiring to induce aliens illegally to enter the United States, or to attempting to bring illegal aliens into the United States in violation of 8 U.S.C. § 1324(a). Despite those pleas, they took direct appeals and now attack their convictions on several grounds. We reject their claims and affirm the convictions.
I.
In their plea proffers, appellants admitted to conspiring to transport 191 Ecuadorian nationals in order to facilitate their illegal entry into the United States. Appellants attempted to transport the passengers via a 54-foot fishing vessel, the José Alexander II. Delgado-Garcia was the captain and piloted the ship. Bravo-Ceneño was the ship’s mechanic. Prado-Morales was a crew member.
The ship’s voyage began May 27, 2002, from a position some distance off-shore from Santa Elena, Ecuador. The plan apparently was to transport the Ecuadorians on the ship to Mexico, and for the Ecuadorians to enter the United States by land from there. On or about June 6, 2002, a United States Navy helicopter sighted the vessel off the Guatemalan coast and recognized it as being overcrowded. Upon the approach of the helicopter, the vessel changed course. The vessel displayed no running lights, flew no flags, and had at least 70 passengers visible on the deck. Thereafter, the U.S.S. Fife, a United States Navy ship carrying a United States Coast Guard law enforcement detachment (“LEDET”), located the vessel, later identified as the José Alexander II, in international waters, 170 nautical miles south of Guatemala and Mexico. After monitoring the movements of the vessel, the LEDET hailed it to begin questioning, but received no response. The LEDET launched a boat from the U.S.S. Fife, approached the *1340 vessel, and attempted questioning from the boat. Migrants on board the José Alexander II responded to questioning that they had inadequate food, water, and fuel; that they had left Gayaquil, Equador, on May 27, 2002; and that the master and crew of the ship had left before the U.S.S. Fife’s approach. After rendering assistance and verifying that one of the passengers could navigate the vessel to Guatemala, the LE-DET advised the migrants to take the vessel to the port at Quetzal and escorted it there. Thereafter, LEDET personnel determined, based on interviews with the passengers and further investigation, that the ship had been attempting to facilitate the illegal immigration of the passengers to the United States.
A grand jury charged appellants with conspiracy to encourage and induce aliens illegally to enter the United States, in violation of 8 U.S.C. §§ 1324(a)(1)(A)(v), (a)(1)(A)(iv), and (a)(l)(B)(I), and attempted bringing of unauthorized aliens to the United States, in violation of 8 U.S.C. §§ 1324(a)(2) and (a)(2)(B)(ii). Appellants moved to dismiss the indictment on several grounds. They contended that the indictment did not charge an offense under § 1324(a), arguing that the statute does not apply extraterritorially. Appellants also asserted that their interdiction violated international law, as the José Alexander II, they claimed, was under the exclusive jurisdiction of Ecuador and the government of Ecuador did not consent to the U.S. government escorting that vessel to Ecuador. They argued, additionally, that the Fife’s crew had exceeded the authority granted under 14 U.S.C. § 89(a). That provision gives the Coast Guard authority, among other things, to “make inquiries, examinations, inspections, searches, seizures, and arrests upon the high seas and waters over which the United States has jurisdiction, for the prevention, detection, and suppression of violations of laws of the United States.” Appellants claimed that this provision did not authorize the interdiction of the José Alexander II because it was in international, not U.S., waters when the Fife approached it, and because the crew lacked reasonable suspicion to believe that the vessel’s crew was engaged in illegal activity that would affect the United States. Lastly, appellants argued that prosecuting them under § 1324(a) violated the Fifth Amendment’s due process clause, as there was no “nexus” between appellants’ conduct and the territory of the United States.
On January 31, 2003, the district court denied appellants’ motion. Shortly thereafter, in February 2003, Prado-Morales and Bravo-Ceneño unconditionally pleaded guilty to the conspiracy count in the indictment and Delgado-Gareia unconditionally pleaded guilty to the attempt count. This appeal followed.
II.
This direct criminal appeal comes to us in a strange posture. Appellants moved to dismiss the indictment on the statutory, constitutional, and international-law grounds they now raise on appeal. Yet they unconditionally pleaded guilty to the crimes of which they were charged. The first issue we address, therefore, is whether their unconditional pleas waived the claims they now assert on appeal. For the reasons that follow, we hold that these pleas waived all of appellants’ claims. However, the government does not advance the argument that the unconditional pleas waived appellants’ claim that § 1324(a) does not apply extraterritorially. The government has thus waived its waiver argument on that point. Cf. United States v. Johnson, 216 F.3d 1162, 1166 (D.C.Cir.2000) (discussing the government’s waiving of a defendant’s procedural *1341 default). We therefore reach the merits of appellants’ claim that § 1324(a) does not apply extraterritorially.
Appellants assert four claims on appeal; these claims are, more or less, the same arguments that were the basis of their motion to dismiss the indictment. First, appellants reassert their claim that the substantive statute which they by their pleas admitted violating, 8 U.S.C. § 1324(a), does not apply extraterritorially, and therefore not to them in this case. Second, appellants argue that the government failed to prove that they committed a crime with effects in the United States, and therefore did not prove a “nexus” between appellants’ conduct and the United States, as they claim the Fifth Amendment’s due process clause requires. Third, appellants assert that their prosecution violated 14 U.S.C. § 89(a), for the same reasons they asserted below. Finally, appellants claim that their apprehension violated customary international law and a treaty to which the United States is a party.
Appellants waived all of these claims by pleading guilty unconditionally. Unconditional guilty pleas that are knowing and intelligent - and there is no claim that appellants’ pleas were otherwise - waive the pleading defendants’ claims of error on appeal, even constitutional claims. See, e.g., United States v. Drew, 200 F.3d 871, 876 (D.C.Cir.2000). There are two recognized exceptions to this rule. The first is the defendant’s claimed right “not to be haled into court at all;” for example, a claim that the charged offense violates the double jeopardy clause. Blackledge v. Perry, 417 U.S. 21, 30-31, 94 S.Ct. 2098, 2103-04, 40 L.Ed.2d 628 (1974); see also Menna v. New York, 423 U.S. 61, 62-63 & n. 2, 96 S.Ct. 241, 242, 46 L.Ed.2d 195 (1975) (per curiam). This is the so-called “Blackledge/Menna” exception. The second is that the court below lacked subject-matter jurisdiction over the case, as a claim of lack of subject-matter jurisdiction, “because it involves a court’s power to hear a case, can never be forfeited or waived.” United States v. Cotton, 535 U.S. 625, 630, 122 S.Ct. 1781, 1784, 152 L.Ed.2d 860 (2002) (citing Steel Co. v. Citizens for a Better Environment, 523 U.S. 83, 89, 118 S.Ct. 1003, 1009, 140 L.Ed.2d 210 (1998)).
None of appellants’ claims falls into either of these exceptions. As to the subject-matter jurisdiction exception: there is no question that the district court had subject-matter jurisdiction over appellants’ case. Appellants’ best argument to the contrary rests on their claim that the indictment failed to state an offense, which they claim deprived the district court of subject-matter jurisdiction over them. The government apparently agrees with appellants that this purported defect in the indictment concerns the district court’s subject matter jurisdiction over appellants’ case, rather than the merits of the case.
We do not agree. Under Article III of the Constitution, “[t]he judicial power of the United States” is “vested ... in such inferior Courts as Congress may from time to time establish.” U.S. Const, art. Ill, § 2. Congress conferred original jurisdiction on the district court over appellants’ case by enacting 18 U.S.C. § 3231. That statute, passed originally in 1948, see 62 Stat. 826, provides that the “district courts of the United States shall have original jurisdiction ... of all offenses against the laws of the United States.” The ordinary meaning of the term “jurisdiction” at the time that statute was passed referred to a court’s power to “declar[e] and administer! ] law or justice.” 5 The Oxford English Dictionary 635 (1933); see also Webster’s Third New International Dictionary 1227 (1961). Section 3231 identifies “of *1342 fenses against the laws of the United States” as the relevant “law” over which the court has “power” (or “jurisdiction”). The power to declare that law includes the power to decide whether the offense charged is a true offense, for, as Justice Holmes noted long ago, that power remains whether the court’s “decision” on the law (in this instance, the court’s judgment as to the “offense”) “is right or wrong.” Lamar v. United States, 240 U.S. 60, 65, 36 S.Ct. 255, 256, 60 L.Ed. 526 (1916) (noting that “[t]he objection that the indictment does not charge a crime against the United States goes only to the merits of the case” rather than the court’s jurisdiction). The district court’s subject matter jurisdiction in this case therefore included the power to decide whether the indictment charged a proper “offense.”[1]
None of the statutory or constitutional provisions appellants cite divested the district court of its original jurisdiction under § 3231. The substantive statute appellants pleaded guilty to violating, 8 U.S.C. § 1324(a), does not so much as mention the court’s “jurisdiction.” The treaty to which appellants point us - The Convention on the High Seas - does state that “ships that sail under the flag of one State only ... shall be subject to its exclusive jurisdiction on the high seas.” Convention On the Law of the Sea, Sept. 30, 1962, art. 6, § 1, 13 U.S.T. 2312. “Jurisdiction” in this sense, however, refers to the general authority of the U.S. government over the ship at issue, including the executive branch’s authority, not the power of the district court in particular over prosecutions arising out of the executive’s assertion of such authority. The term “jurisdiction” is also used in this way in 14 U.S.C. § 89(a), and in the customary international law doctrines to which appellants point us. Finally, appellants’ Fifth Amendment claim is irrelevant to the court’s Article III subject matter jurisdiction. The Constitution by its terms leaves it solely to Congress to allocate that power by statute, and there is no claim in this case that this jurisdictional grant is somehow independently unconstitutional.
Precedent bolsters our conclusion that the substantive sufficiency of the indictment is a question that goes to the merits of the case, rather than the district court’s subject-matter jurisdiction. The Supreme Court’s decision in United States v. Cotton, 535 U.S. 625, 122 S.Ct. 1781, 152 L.Ed.2d 860 (2002), supports this conclusion. There, the Court held that the failure of an indictment to state a sentencing element required to be submitted to the jury and proven beyond a reasonable doubt was not a jurisdictional defect that required automatic reversal of the conviction. Id. at 630-31, 122 S.Ct. at 1784. “Defects in an indictment do not deprive a court of its power to adjudicate a ease,” the Court explained; the issue of the indictment’s substantive sufficiency instead goes to the merits. Id. We also note that at least two circuits have held that the question of an indictment’s failure to state an offense is an issue that goes to the merits of a case, not the district court’s subject-matter jurisdiction. See United States v. Gonzalez, 311 F.3d 440, 442 (1st Cir.2002), cert. denied, - U.S. -, 124 S.Ct. 47, 157 L.Ed.2d 49 (2003); United States v. Brown, 164 F.3d 518, 520-22 (10th Cir.1998).
Nor do appellants’ claims fall into the second, Blackledge/Menna exception. That exception concerns the right of defendants “not to be haled into court at all” as that phrase was used in Blackledge v. Per *1343 ry, 417 U.S. 21, 94 S.Ct. 2098, 40 L.Ed.2d 628 (1974), and Menna v. New York, 423 U.S. 61, 96 S.Ct. 241, 46 L.Ed.2d 195 (1975) (per curiam). Perry, the case in which the Court first applied this exception, involved a defendant whom the state of North Carolina had convicted of misdemeanor assault and given a six-month sentence. After the defendant filed his notice of appeal from that conviction, the state prosecutor obtained an indictment against him on a felony assault charge based on the same conduct that gave rise to the misdemeanor charge. 417 U.S. at 22-23, 94 S.Ct. at 2099. Perry pleaded guilty to that charge, but later claimed that the second charge violated his due-process rights because the charge penalized him for exercising his statutory right to appeal. Id. at 25-26, 94 S.Ct. at 2100-01. The Supreme Court held that Perry’s guilty plea did not waive his due-process claim, because Perry’s constitutional claim of prosecutorial vindictiveness “went to the very power of the state to bring [Perry] into court to answer the charge brought against him.” Id at 30, 94 S.Ct. at 2103. The right, the Court reasoned, was the “right not to be haled into court at all upon the felony charge,” and therefore implicated the “distinctive” procedural injury against which a right “to prevent a trial from taking place at all” protects. Id at 30-31, 94 S.Ct. at 2103-04. The Court later clarified that the Blackledge exception applies to double jeopardy claims. Menna, 423 U.S. at 62-63, 96 S.Ct. at 242.
The injury associated with appellants’ claims is not comparable to-the injury the Supreme Court identified in Blackledge and Menna. Appellants’ only constitutional claim is that their prosecution violates the Fifth Amendment’s due process clause because “none of the specific actions attributed to appellants were aimed at causing criminal acts within the United States.” Br. for Appellants at 20. That assertion is a claim that the due process clause limits the substantive reach of the conduct elements of 8 U.S.C. § 1324(a), not a claim that the court lacks the power to bring them to court at all. Even if the prosecution of appellants violated the Fifth Amendment for this reason, appellants would still need to come to “court to answer the charge brought against” them. Blackledge, 417 U.S. at 30, 94 S.Ct. at 2103.
In any event, even assuming that appellants’ Fifth Amendment claim concerns the power of the court to force them to appear, that claim still is waived. The indictments clearly alleged that appellants intended to smuggle, aliens into the United, States, thereby causing effects there. While appellants would have us look beyond the indictment to the underlying facts surrounding the interdiction of the José Alexander II to show-the absence of a nexus, there was no arguable facial constitutional infirmity in the indictment, and the Black-ledge/Menna waiver exception does not apply. See United States v. Broce, 488 U.S. 563, 575, 109 S.Ct. 757, 765, 102 L.Ed.2d 927 (1989).
For these reasons, as a matter of pure legal principle, appellants’ guilty pleas waived all of their claims. That conclusion is sufficient to dispose of all of appellants’ claims on appeal, save for them claim that 8 U.S.C. § 1324(a) does not apply extraterritorially. However, the government’s brief strangely “assumes for present purposes” that appellants have not waived their claim as to the extraterritorial application of § 1324(a). The government has therefore waived its waiyer argument on that point. See United States v. Johnson, supra.
III.
The government’s concession impels us to decide whether § 1324(a) criminalizes *1344 appellants’ extraterritorial conduct. We hold that it does.
Appellants pleaded guilty to two distinct crimes. PradoMorales and Bravo-Ceneño pleaded guilty to conspiracy to encourage and induce aliens illegally to enter the United States. The statute that defines that crime prohibits conspiring to
encourage[ ] or induee[ ] an alien to come to, enter, or reside in the United States, knowing or in reckless disregard of the fact that such coming to, entry, or residence is or will be in violation of law.
8 U.S.C. § 1324(a)(1)(A)(iv), (a)(1)(A)(v)(I). The second crime, to which Delgado-Gar-da pleaded guilty, is the attempted bringing of unauthorized aliens to the United States. The statute that defines that crime provides:
Any person who, knowing or in reckless disregard of the fact that an alien has not received prior official authorization to come to, enter, or reside in the United States, brings to or attempts to bring to the United States in any manner whatsoever, such alien, regardless of any official action which may later be taken with respect to such alien, for each alien in respect to whom a violation of this paragraph occurs
commits a federal crime. Id. § 1324(a)(2).
Both of these statutes apply ex-traterritorially. Appellants’ argument that they do not invokes the presumption against reading statutes to have extraterritorial effect. See, e.g., Sale v. Haitian Centers Council, Inc., 509 U.S. 155, 173, 113 S.Ct. 2549, 2559, 125 L.Ed.2d 128 (1993); EEOC v. Arabian Am. Oil Co., 499 U.S. 244, 250-51, 111 S.Ct. 1227, 1231, 113 L.Ed.2d 274 (1991). This presumption, properly understood, does not mean that § 1324(a) criminalizes only domestic conduct. The presumption against extraterritorial application of domestic statutes “is based on the assumption that Congress is primarily concerned with domestic conditions.” Foley Bros. v. Filardo, 336 U.S. 281, 285, 69 S.Ct. 575, 577, 93 L.Ed. 680 (1949); see also Smith v. United States, 507 U.S. 197, 206-07 n. 5, 113 S.Ct. 1178, 1184 n. 5, 122 L.Ed.2d 548 (1993). This presumption embodies sensible contextual linguistic reasons for reading the plain texts of domestic statutes not to apply everywhere in the world. Because Congress’s primary arena of sovereignty is the territorial United States, it makes sense to presume, absent other evidence, that its commands linguistically apply only there. Therefore, we presumptively read the text of congressional statutes not to apply ex-traterritorially, unless there are contextual reasons for reading the text otherwise.
As the dissent points out, the presumption, and indeed the underlying proposition that Congress legislates primarily with domestic conditions in mind, in part makes sense because we assume that Congress desires to avoid conflict with other nations. That helps explain why we presume statutes not to apply extraterritorially, unless there are contextual reasons for reading the text otherwise. Contextual reasons, in our view, supply the “affirmative evidence” the Supreme Court requires to overcome the presumption.
The dissent suggests that our discussion of this presumption conflicts with dictum in Kollias v. D & G Marine Maintenance, 29 F.3d 67 (2d Cir.1994). Dissent at 1353. In fact, we agree with the Second Circuit’s statement (which was not essential to its holding, as the court held that the statute in question did in fact apply extraterritorially, id. at 73-75) that “all statutes, without exception, [should] be construed to apply within the United States only, unless a contrary intent appears,” id. at 71. Our point is that contextual factors show that Congress had a contrary intent in this case.
*1345 The presumption embodies a sensible caution against reading statutes lightly to apply outside U.S. borders. Like any linguistic convention, it depends on contingent real-world assumptions. The point of the policy concerns “behind” the presumption against applying statutes to have extraterritorial effect is that they mean that a court should ordinarily understand Congress’s commands to apply only within U.S. borders, not that a court should itself apply those policy concerns to the case at bar and read the statute based on the result of its own policy analysis. Because, as the dissent correctly states, “[djecisions about when to subject foreign nationals and foreign conduct to the United States’ laws invoke delicate questions of jurisdiction and international relations” and because “courts ... lack the foreign policy expertise of the legislative and executive branches,” dissent at 1352, we must apply the canons of construction to interpret, not rewrite, congressional acts. However, in examining the statute for congressional intention of extraterritorial application, we consider both contextual and textual evidence. That is what our analysis below represents.
Read in context, § 1324(a) applies extraterritorially. On its face, it concerns much more than merely “domestic conditions.” It protects the borders of the United States against illegal immigration. As the terrorist attacks of September 11, 2001 reminded us starkly, this country’s border-control policies are of crucial importance to the national security and foreign policy of the United States, regardless whether it would be possible, in an abstract sense, to protect our borders using only domestic measures. This contextual feature of § 1324(a) establishes that it is fundamentally international, not simply domestic, in focus and effect. The presumption that Congress’s commands do not reach those outside the borders of the United States is overcome by affirmative contextual evidence of congressional intent. It is natural to expect that a statute that protects the borders of the United States, unlike ordinary domestic statutes, would reach those outside the borders. It makes no sense to presume that such a statute applies only domestically. We agree with the dissent that whether a statute should apply extraterritorially is a judgment for Congress, dissent at 1357-58; our point is that this contextual feature shows that this is the judgment Congress made in § 1324(a).
But more than simply the fact that this statute is international in focus shows that it applies extraterritorially. There is also specific textual evidence that, as the Supreme Court observed in United States v. Bowman, “the natural inference from the character of the offense[s]” is that an extraterritorial location “would be a probable place for [their] commission.” 260 U.S. 94, 99, 43 S.Ct. 39, 41, 67 L.Ed. 149 (1922). That evidence strengthens our conclusion that, read in context, these crimes apply to extraterritorial conduct.
The Supreme Court’s decision in Bowman supports the validity of this inference. Bowman was a case in which the Supreme Court concluded that the crime of defrauding a corporation in which the United States was a.stockholder applied to U.S. citizens abroad. Id. at 102-03, 43 S.Ct. at 41. Bowman, we acknowledge, is not directly on point. Bowman involved criminal defendants who were U.S. citizens and the offense was fraud against the United States, id. at 102-03, 43 S.Ct. at 41; this case, in contrast, involves aliens and immigration offense^. These differences, however, do not lessen Bowman’s force as applied to this case. The first difference, the citizenship of the defendants, is irrelevant. While Bowman did qualify its hold *1346 ing by noting that no aliens were before the Court, Bowman’s logic did not depend on this fact. The Bowman Court’s reasoning was much more pointed than that. The Court noted that the fraud statute under which the prosecution in Bowman was proceeding was amended in 1918 to extend its protection, theretofore limited to government departments, to “any corporation in which the United States of America is a stockholder.” From the timing of the amendment, the Court reasoned that Congress intended to protect the Emergency Fleet Corporation. Id. at 101-02, 43 S.Ct. at 41. The Court therefore concluded that the statute criminalizing defrauding a U.S. corporation applied ex-traterritorially because the Emergency Fleet Corporation, a U.S. corporation, “was expected to engage in, and did engage in, a most extensive ocean transportation business.” Id. at 101, 43 S.Ct. at 41. Because of this expectation, the Court reasoned, many persons who commit the crime of defrauding a U.S. corporation would do so overseas, and therefore the statute had extraterritorial application. Bowman is therefore analogous because, as discussed more fully below, the same expectation holds of § 1324(a). For these reasons, we disagree with the dissent that the fact that Bowman involved a U.S. citizen lessens its force as applied to this case. Dissent at 1354.
The second main difference between this case and Bowman - that this case involves immigration offenses rather than frauds against the United States - shows that Bowman applies with even greater force to § 1324(a). Fraud against the United States does not necessarily concern the national security and foreign affairs of the United States, unlike § 1324(a). Moreover, there is no obvious reason why frauds against the United States, simplici-ter, would occur overseas, apart from the expectation that the Emergency Fleet Corporation would engage in extensive overseas operations. However, there is every reason to think that much of the conduct that § 1324(a) criminalizes occurs beyond the borders of the United States. In reaching its conclusion that the fraud statute before it in Bowman applied extra-territorially, the Supreme Court recited several other statutes, not expressly territorial, but which might by the very nature of the crime outlawed be supposed to apply extraterritorially. Among these, Chief Justice Taft, for the Court, noted the punishment of a consul who knowingly certified a false invoice, the forging or altering of a ship’s papers, the enticing of desertions from naval service, and the bribing of a United States officer in civil, military, or naval service. As to all of these, the Court noted that Congress “clearly” intended the locus of the crime to be in foreign countries, on the high seas, or otherwise extraterritorial. 260 U.S. at 99, 43 S.Ct. at 41. In short, Bowman is a most persuasive precedent for a conclusion that § 1324(a) applies extraterritorially.
The dissent’s attempt to distinguish Bowman in other respects is unpersuasive. The dissent opines that Bowman is distinguishable because unlike this case, Bowman and other internationally focused statutes concern crimes that would “harm the United States government even if [they were] completed abroad,” dissent at 1355, and because in this case, the harm is “less direct and less immediate.” Id. Such policy reasoning is for Congress, not this Court, in the first instance. Anyway, it is difficult to see how the harm threatened by attempted illegal immigration is any less “direct and immediate” than, say, the crime of conspiring to commit a terrorist act against an American target. The border-control statutes at issue here are “not logically dependant on their locality” in the same sense that the fraud offense *1347 against the United States was not in Bowman: they have many obvious extraterritorial applications.
Like the statute at issue in Bowman, § 1324(a), by its terms, applies to much extraterritorial conduct. Subsections (a)(1)(A) and (a)(2) of that provision both proscribe “attempts to bring” aliens “to the United States.” Many incomplete attempts occur outside the territorial jurisdiction of the United States. “Bringing” someone suggests entry - or at least physical proximity. Because an alien will not be in the United States if the attempt is incomplete, the offender will ordinarily also be outside the United States during the attempt. This is true even if the government foils many incomplete attempts at the borders of the United States. That many attempts to bring someone into the United States will occur outside the United States is strongly suggestive that these subsections and their neighbors apply, as a matter of ordinary language, to extraterritorial acts. For this reason, we disagree with the dissent that the text of § 1324(a) is equally amenable to a purely domestic reading in light of Bowman.
Appellants’ response to this argument is not persuasive. Appellants’ counsel at oral argument argued that any substantive offense may be joined with an attempt statute; therefore, they claim, this reasoning would eviscerate the presumption against extraterritorial application of statutes, since any substantive statute could have extraterritorial application simply by being joined with an attempt statute. In fact, our holding will create no such sweeping precedent. The attempt provisions of § 1324(a) have extraterritorial application not because they are attempt crimes, but rather because offenders will often be outside the United States when they attempt to commit the crime. This feature of § 1324(a) does not result not from the fact that it punishes attempts. It results from the fact that the crime involves transporting aliens into the United States.
The forfeiture provision applicable to § 1324(a) bolsters the inference that § 1324(a) applies extraterritorially. It provides:
Any conveyance, including any vessel, vehicle, or aircraft, which has been or is being used in the commission of a violation of subsection (a) of this section shall be seized and subject to a forfeiture.
8 U.S.C. § 1324(b)(1). The breadth of this provision strongly suggests that subsection (a) itself has extraterritorial application. Vessels, vehicles, and aircraft used in committing violations of subsection (a) are often used internationally, as transporting illegal immigrants requires movement from one country to another. Therefore, § 1324(b)(1) itself has extraterritorial application. It seems unlikely that Congress would give the government broad power to seize the conveyances used to effect illegal immigration in subsection (b)(1) without simultaneously conferring the power, in subsection (a), to punish the offenders operating those conveyances internationally. Congress would not, for example, have given the executive the power to seize ships abroad if it were not also possible to convict those operating the ships abroad, and it is a traditional canon of statutory construction to construe related statutory provisions in similar fashion. Our reasoning on this score is, therefore, not “circular,” dissent at 1357; our point is that such a reading would be textually strange in light of the independent fact that (b)(1), as the dissent does not deny, applies extraterrito-rially. Reading § 1324(a) to have extraterritorial application thus harmonizes these related provisions.
Finally, the prohibition on encouraging or inducing illegal immigration, § 1324(a)(l)(A)(iv), also has many natural *1348 extraterritorial applications. Certainly it is possible to induce a potential illegal immigrant to come to the United States from within the United States, as appellants and the dissent emphasize, but it is obviously much easier to do so when in proximity to the immigrant. It is also possible to conspire to induce illegal immigration into the United States from anywhere in the world; but, again, it is easier to do so outside the United States, in proximity to those who carry out the plot. This provision therefore by its terms contemplates application to much extraterritorial conduct.
Nothing in Sale and Arabian Oil Co. compels the conclusion that § 1324(a) applies only domestically. Those decisions involved very different statutes. Although Sale also involved an immigration statute, that statute was crucially different from § 1324(a). The statute in Sale, 8 U.S.C. § 1253(h), governed deportation proceedings. The Court, quite apart from the presumption against extraterritorial application, read this provision, by its terms, to apply only to domestic deportation proceedings and “contemplated that such proceedings would be held in the country,” as the statute referred specifically to the Attorney General, a domestic official, and the Attorney General was not authorized to conduct deportation proceedings outside of the country. 509 U.S. at 173, 113 S.Ct. at 2559. In contrast, § 1324(a) is not fundamentally domestic in focus, but has a great many international applications.[2]
Similarly, the statute in Arabian Oil Co. involved “boilerplate” language “which can be found in any number of congressional Acts, none of which have ever been held to apply overseas.” 499 U.S. at 250-51, 111 S.Ct. at 1231. The objective evidence of extraterritorial application the Court found lacking there, in contrast, is present in § 1324(a). The language of § 1324(a) is distinctive, not boilerplate, and applies to a great many acts that one customarily would expect to occur overseas.
The Supreme Court’s recent decision in F. Hoffman-La Roche Ltd. v. Empagran S.A., — U.S. -, 124 S.Ct. 2359, 159 L.Ed.2d 226 (2004), dissent at 1352, is not to the contrary. Empagran was an international price-fixing antitrust suit against several foreign and domestic vitamin manufacturers and distributors. Id. at 2364. The Court held that plaintiffs’ suit failed to state a claim under U.S. antitrust statutes, assuming that plaintiffs’ suit only alleged international anticompetitive effects that were completely independent from any adverse domestic effects. Id. at 2366-72. The Court rejected plaintiffs’ argument that the “more natural reading” of the statutes was that they could state a claim solely based on such effects, because of the presumption against applying statutes ex-traterritorially and because the Court read the statutes to permit, but not require, either a foreign or domestic reading. Id. at 2366, 2372.
The Supreme Court’s rejection of plaintiffs’ argument is consistent with our tex *1349 tual analysis of § 1324(a). In Empagran, the Court assumed for purposes of analysis that plaintiffs’ suit alleged foreign conduct that lacked any domestic nexus whatsoever. The Court acknowledged that “our courts have long held that application of our antitrust laws to foreign anticompet-itive conduct is nonetheless reasonable, and hence consistent with the principles of prescriptive comity, insofar as they reflect a legislative effort to redress domestic antitrust injury that foreign anticompetitive conduct has caused.” id., at 2366-67 (quoting United States v. Aluminum Co., 148 F.2d 416, 443-44 (2d Cir.1945) (L. Hand, J.) (citing, among other cases, United States v. Bowman)), even though no express language in those laws made such foreign conduct unlawful. That longstanding recognition that the antitrust laws apply to such foreign conduct that impinges on domestic affairs supports our interpretation of the statute before us, as the offenses before us have such effects.
Nor are we persuaded by appellants’ and the dissent’s citation to the Maritime Drug Law Enforcement Act, 47 U.S.C.App. §§ 1901-03. This act criminalizes the manufacture, distribution, and possession of controlled substances, and explicitly applies to extraterritorial acts. Id. § 1903(a), (h). Appellants argue, and the dissent repeats, that because this statute is similar to § 1324(a), yet explicitly applies extraterritorially, we should infer from the absence of the same explicit statement in § 1324(a) that it does not apply extraterritorially.
We do not find it surprising that Congress chose to use more explicit language specifying extraterritorial application in the Maritime Drug Law Enforcement Act than it did in § 1324(a). A border-control statute is more outward-looking than is a prohibition on drug manufacturing. That may well be why Congress also thought it necessary to specify explicitly in the Enforcement Act that “trafficking in controlled substances aboard vessels is a serious international problem.” 46 U.S.CApp. § 1902. The international focus of § 1324(a), in contrast, is more obvious. Although appellants are correct that, where Congress uses different language in otherwise similar provisions, it is wise to presume that Congress means different things, § 1324(a) and the Enforcement Act are not sufficiently otherwise similar to invoke that reasoning.
We recognize that our holding as to the extraterritorial application of the attempt provisions of § 1324(a) conflicts with Yenkichi Ito v. United States, 64 F.2d 73, 75 (9th Cir.1933). The Ninth Circuit rested this holding on its assumption that “there is nothing in [§ 1324(a) ] to indicate that Congress intended it to be effective outside of the recognized territorial limits of the United States.” Id. As we have discussed, we disagree.
Our dissenting colleague relies on the legislative history of § 1324(a), dissent at 1358-59, citing the 1903 congressional act that added the attempt provision of § 1324(a) and the recodification of that act in 1917, and arguing that there is nothing in this history that “suggests] that the 1903 substitution of the term ‘attempt’ for ‘aid’ was intended to expand the bringing offense extraterritorially,” dissent at 1359. Such silence proves little, in light of the fact that, as we have discussed, the evidence is apparent from the text of § 1324(a). The same can be said of the silence the dissent cites in the legislative history of the encouragement/inducement provision of § 1324(a). Dissent at 1359-60.
Second, the dissent points out that the Ninth Circuit handed down its decision in Yenkichi Ito in 1933, and that Congress has nowhere attempted to correct that un *1350 derstanding in subsequent amendments to § 1324(a). Dissent at 1359-60. This argument fails on two fronts. For one, the Supreme Court decided United States v. Bowman in 1922, a case that the Ninth Circuit did not cite, so it is unclear whether Congress’s silence was the result of its understanding that the plain textual evidence it had supplied already made the extraterritorial application of the statute clear under the reasoning of Bowman. For another, other elderly Court of Appeals cases, including cases from the Ninth Circuit, have long held the closely related inducement section of the statute capable of extraterritorial application. Most glaringly, the Fifth Circuit held as much in Claramont v. United States, 26 F.2d 797 (5th Cir.1928) (per curiam), a decision that, like Yenkichi Ito, was the law of a circuit whose decisions governed large portions of the U.S. coast. See also United States v. Nunez, 668 F.2d 10, 12-13 (1st Cir.1981) (per curiam) (same, citing Castillo-Felix)-, United States v. Castillo-Felix, 539 F.2d 9, 12-13 (9th Cir.1976) (same, citing Bowman); United States v. Correa-Negron, 462 F.2d 613, 614 (9th Cir.1972) (per curiam) (same, citing Claramont). Therefore, the state of the law dating from 1922 on the extraterritorial application of § 1324(a) is, at best, ambiguous, and at worst, contrary to the dissent’s position in view of Bowman. Congress’s silence on this point thus does not support the dissent’s reading of the statute.
Third, the dissent cites a single sentence from a letter from the Department of Justice commenting on the current version of the Immigration and Control Act of 1986, then pending before the House Committee on the Judiciary, which the Committee appended to a House Report on the bill. The dissent says that the Department said in this sentence that it “would not prosecute the attempted bringing offense outside of the United States.” Dissent at 1359-60. Citing two Court of Appeals cases, as we read the letter, the Department opined that the encouragement/inducement provision of § 1324(a) “is the only provision in [that section] that has extra-territorial application.” H.R.Rep. No. 99-682, pt. 1, at 112 (1986). Putting to one side that this piece of history contradicts the dissent’s conclusion that the encouragement/inducement section does not have extraterritorial application, we think it does not stand for the proposition that the encouragemenVinducement provision of § 1324(a) applies only domestically. The only support the Department offered for its opinion was a citation to two Court of Appeals cases, both of which held only that the encouragement/inducement provisions of § 1324(a) did not have extraterritorial application. See id. (citing Nunez, Castillo-Felix, and “cases cited therein”). Those cases and the cases those cases cited, however, said nothing about whether the attempt provision of § 1324(a) had extraterritorial application. In light of that silence, we think that the Department was merely stating its opinion that no court cases have held the attempt provisions to have extraterritorial application. It was not stating its official interpretation of § 1324(a). We therefore give this piece of legislative history little weight.
We close with a concluding observation on the alarming consequences the dissent sees in our holding. Dissent at 1361-62. The dissent raises the specter that our holding that § 1324(a) applies extraterrito-rially risks creating conflicts with the laws of other nations, and that we should not do so given our lack of foreign policy expertise. As we have discussed, we have confined our analysis to interpreting the words of Congress in light of the presumption against extraterritorial application, not foreign policy analysis. But it is worth pointing out that, in any event, our holding *1351 does not pose a significant risk of creating any such conflict. While we lack foreign policy expertise, the executive branch, the branch of government primarily concerned with foreign affairs and the branch charged with administering § 1324(a), has it in spades. The practical consequence of our holding is merely to leave the question of how best to navigate such potential conflicts to the executive, “the sole organ of the federal government in the field of international relations.” United States v. Curtiss-Wright Export Corp., 299 U.S. 304, 320, 57 S.Ct. 216, 220, 81 L.Ed. 255 (1936). The executive’s expert exercise of prosecu-torial discretion and foreign diplomacy should be more than sufficient to avoid the conflicts the dissent thinks our holding risks creating.
IV.
Although the dissent believes that “the combination of a statutory text that permits but does not require extraterritorial application and a silent legislative history is not enough of a basis for a court to decide to apply” a statute extraterritorially, dissent at 1361, the same textual evidence used by the Supreme Court in Bowman and § 1324(a)’s international focus suggest otherwise. For those two reasons, and others expressed above, appellants’ convictions are affirmed.

. We express no view on what remedies would be available to such a defendant asserting inadequate legal counsel after having pleaded guilty.

. The Sale Court stated that even if it did not read the act by its terms to apply only to "strictly domestic procedures, the presumption that Acts of Congress do not ordinarily apply outside our borders would support” a purely domestic interpretation of the relevant statute. 509 U.S. at 173, 113 S.Ct. at 2559. Even if the language of the statute did not apply solely to "domestic procedures,” however, that does not change the fact that this language referred specifically to the Attorney General, a domestic official, and that the Court applied the presumption to that statute as it was written, not to some hypothetical statute that omitted those words. Our point is that these words are very different from the language in the statute at issue here and therefore that our application of the presumption compels the conclusion that § 1324(a) applies to extraterritorial conduct.