# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued December 16, 2019          Decided January 21, 2020

No. 17-3091

UNITED STATES OF AMERICA,
APPELLEE

v.

JOSE EMANUEL GARCIA SOTA, ALSO KNOWN AS JUAN MANUEL
MALDONADO AMEZCUA, ALSO KNOWN AS ZAFADO, ALSO
KNOWN AS SAFADO,
APPELLANT

———

Consolidated with 17-3092

———

Appeals from the United States District Court
for the District of Columbia
(No. 1:13-cr-00142-1)
(No. 1:13-cr-00143-1)

———

*Matthew B. Kaplan*, appointed by the court, argued the
cause for appellants. With him on the briefs was *Elita C.
Amato*.

*John M. Pellettieri*, Attorney, U.S. Department of Justice,
argued the cause for appellee. With him on the brief were
*Jessie K. Liu*, U.S. Attorney, and *Karen P.W. Seifert*, Assistant

U.S. Attorney. *Elizabeth Trosman*, Assistant U.S. Attorney, entered an appearance.

Before: WILKINS, *Circuit Judge*, and WILLIAMS and SENTELLE, *Senior Circuit Judges*.

Opinion for the Court filed by *Senior Circuit Judge* WILLIAMS.

WILLIAMS, *Senior Circuit Judge*: According to a longstanding canon of statutory interpretation, our courts presume that American laws do not apply outside of the United States—unless Congress directs otherwise. Here two criminal defendants attacked a pair of American law enforcement officers in Mexico, killing one and wounding the other; they now argue that the canon requires us to set aside three of the ensuing convictions for each defendant.

After apprehension and extradition to the United States, the defendants stood trial in the District of Columbia, and a jury convicted each on four counts: two counts under 18 U.S.C. § 1114, which criminalizes the killing of an officer or employee of the United States; one count under 18 U.S.C. § 924(c) for using a firearm while committing a crime of violence; and one count under 18 U.S.C. § 1116, which criminalizes the killing of certain persons protected under international law. In this appeal, the defendants argue that § 1114 and § 924(c) do not apply extraterritorially; they don't contest their convictions under § 1116.

The defendants are correct about § 1114, which has a purely domestic scope, but not about § 924(c), which can apply to conduct overseas. We thus vacate their convictions under § 1114 and remand their cases for a limited resentencing.

3

\* \* \*

In recent years the Supreme Court has applied the canon with increased clarity and insistence. See, e.g., *RJR Nabisco, Inc. v. European Cmty.*, 136 S. Ct. 2090 (2016); *Kiobel v. Royal Dutch Petroleum Co.*, 569 U.S. 108 (2013); *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247 (2010). The canon "rests on the perception that Congress ordinarily legislates with respect to domestic, not foreign, matters." *Morrison*, 561 U.S. at 255. The presumption also "serves to avoid the international discord that can result when U.S. law is applied to conduct in foreign countries." *RJR Nabisco*, 136 S. Ct. at 2100.

But the presumption against extraterritorial application is just a presumption. It can be overcome when Congress "has affirmatively and unmistakably instructed that the statute will" apply abroad. *Id*.

We address first 18 U.S.C. § 1114, then *id*. § 924(c), and finally a sentence enhancement under *id*. § 924(j)(1).

1. Section 1114 provides for the punishment of anyone who

> . . . kills or attempts to kill any officer or employee of the United States or of any agency in any branch of the United States Government (including any member of the uniformed services) while such officer or employee is engaged in or on account of the performance of official duties . . . .

18 U.S.C. § 1114. On its face, § 1114 does not speak to extraterritorial application one way or the other, thus leaving the presumption against extraterritoriality unrebutted.

In a number of ways the context reinforces the case against extraterritorial application of § 1114. Nearby § 1116

criminalizes killing a U.S. officer or employee who is otherwise "entitled pursuant to international law to special protection against attack upon his person, freedom, or dignity." *Id.* § 1116(b)(4)(B). And § 1116 explicitly applies to conduct beyond our borders. See *id.* § 1116(c) (delineating the statute's express extraterritorial scope). Here, as in *United States v. Thompson*, 921 F.3d 263, 266 (D.C. Cir. 2019), Congress's explicit provision for extraterritorial jurisdiction in one provision (§ 1116) militates against inferring any such application for a closely related and nearby provision with no such signal (§ 1114).

(In this case, one of the American law enforcement officers—Agent Victor Avila—possessed diplomatic status, entitling him to protection under § 1116. The other—Agent Jaime Zapata—was only stationed in Mexico temporarily and apparently did not have diplomatic status. Recall that the jury found both defendants guilty under § 1116 for the attempted killing of Avila.)

Strengthening the inference from § 1116 against extraterritorial application of § 1114 is that Congress gave both provisions their current form in a single statute, the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). See Pub. L. 104–132, 110 Stat 1214 (1996). Most notably, AEDPA revised the portion of § 1116 providing for § 1116's extraterritorial application but inserted no similar provision into § 1114. See AEDPA §§ 721, 727.

AEDPA also modified § 1114, but not, so far as we see, in a way that assists the government. Before AEDPA, § 1114 contained a long list of discrete categories of protected U.S. agents working for dozens of U.S. agencies—the list occupies a column and a half of fine print in the United States Code. See 18 U.S.C. § 1114 (1994). As a result of AEDPA, by contrast, § 1114 generically protects "any officer or employee of the

United States or of any agency in any branch of the United States Government." 18 U.S.C. § 1114; AEDPA § 727 (amending § 1114 to its current form). The government correctly notes that some employees in some of the categories specifically protected under the pre-AEDPA § 1114 would have commonly been working overseas, specifically "any security officer of the Department of State or the Foreign Service." The government would have us infer extraterritorial scope in the current, expanded and generalized version of § 1114 from the old § 1114's (supposedly obvious) extraterritorial applications.

But it's far from obvious that the innumerable categories used in the prior version of § 1114 covered a material number of individuals whose work would occur only (or even largely) overseas. Even security officers for the Department of State and Foreign Service perform quite a range of *domestic* tasks, as well as work overseas. See, e.g., *History of the Bureau of Diplomatic Security of the United States Department of State* 186, 209–12 (2011), https://2009-2017.state.gov/documents/organization/176589.pdf (describing role of security officers in protecting foreign dignitaries in the United States as well as the Secretary of State). Indeed, when Congress included the security officers in § 1114, it empowered the officers to arrest those who assaulted the foreign dignitaries the officers protected on U.S. soil, indicating congressional intent to legislate with respect to those officers' domestic activities. See Pub. L. 88–493, 78 Stat 610 (1964). Much the same is true of those working for the "Intelligence Community," another category of officers listed in the pre-AEDPA § 1114 who perform many domestic functions. Viewing it from the opposite perspective, we see that nearly all the categories of U.S. agents explicitly protected by the pre-AEDPA § 1114 work exclusively or at least overwhelmingly within the United States (e.g., National Park Service officers and employees). Accordingly, we cannot see either the pre-AEDPA's § 1114

protections for multiple separate categories of employees, nor AEDPA's switch to generic terms, as conveying any direction to apply the statute to conduct overseas.

Similarly, the government sees significance in current § 1114's parenthetical, "(including any member of the uniformed services)." 18 U.S.C. § 1114. But at the time Congress passed AEDPA, around 85% of U.S. military personnel were stationed at home, so we can't infer anything from the group's inclusion in § 1114. See Tim Kane, *Global U.S. Troop Deployment, 1950-2005*, Heritage Foundation 1 (2006), https://www.heritage.org/defense/report/global-us-troop-deployment-1950-2005 (collecting Department of Defense data).

The government rests primarily on *United States v. Bowman*, 260 U.S. 94 (1922). There the Supreme Court permitted the extraterritorial application of a statute outlawing conspiracy to defraud the government of the United States, including, under a recent amendment, a "corporation in which the United States of America is a stockholder." The amendment clearly included the U.S. Shipping Board Emergency Fleet Corporation, the defendants' victim, and was, the Court said, "evidently intended to protect" precisely that corporation, "in which the United States was the sole stockholder." *Id*. at 101–02.

The Court acknowledged the general rule that if a statute is intended to include offenses "committed out side of the strict territorial jurisdiction [of the United States], it is natural for Congress to say so in the statute, and failure to do so will negative the purpose of Congress in this regard." *Id*. at 98. But it then declared that

> . . . the same rule of interpretation should not be applied to criminal statutes which are, as a class, not

> logically dependent on their locality for the government's jurisdiction, but are enacted because of the right of the government to defend itself against obstruction, or fraud wherever perpetrated, especially if committed by its own citizens, officers, or agents.

*Id.* The Court then proceeded to discuss a series of statutes, unified, as the Court saw it, by the fact that "to limit their locus to the strictly territorial jurisdiction would be greatly to curtail the scope and usefulness of the statute," *id*., citing statutes involving enticing desertions from naval service, thwarting the disposition of property captured as prize, bribing an officer of the United States to violate his duty, or a U.S. consul's certifying a false invoice.

In this court's most recent discussion of *Bowman* we rested our finding that Congress intended extraterritorial application largely on the great likelihood that the outlawed conduct would occur abroad. In *United States v. Delgado-Garcia*, 374 F.3d 1337, 1346 (D.C. Cir. 2004), we upheld extraterritorial application of a statute criminalizing the inducement of and assistance with unauthorized entry into the United States, observing, "It is natural to expect that a statute that protects the borders of the United States, unlike ordinary domestic statutes, would reach those outside the borders." *Id.* at 1345.

The government eschews the idea that *Bowman* and following cases such as *Delgado-Garcia* truly depend on the high probability that the criminalized conduct would occur abroad, and instead urges us to read *Bowman* as a broad rule that "criminal statutes that protect the United States government from harm should not be construed" to apply only within the United States. See Appellee's Br. 15. But such an analysis requires treating almost all the discussion in *Bowman* and *Delgado-Garcia* as surplusage and would purport to rebut

the presumption against extraterritoriality in broad swaths of the U.S. Code.

Finally, the government argues that AEDPA, in reenacting § 1114, implicitly adopted the Eleventh Circuit's decision in *United States v. Benitez*, 741 F.2d 1312, 1317 (11th Cir. 1984), finding the section applicable extraterritorially. But while we presume that Congress knows of "well-settled judicial construction," *United States v. Davis*, 139 S. Ct. 2319, 2331 (2019), a lone appellate case hardly counts. As the Court said in *Jama v. ICE*, 543 U.S. 335, 349 (2005), "Neither of the two requirements for congressional ratification is met here: Congress did not simply reenact [the statute] without change, nor was the supposed judicial consensus so broad and unquestioned that we must presume Congress knew of and endorsed it." So too here.

We acknowledge that since AEDPA the Second Circuit has joined the Eleventh Circuit in finding § 1114 applicable abroad. See *United States v. Siddiqui*, 699 F.3d 690, 701 (2d Cir. 2012) (following the court's prior decision in *United States v. Al Kassar*, 660 F.3d 108, 118 (2d Cir. 2011)). But neither of those circuits addressed the striking differences between § 1114 and its neighbor § 1116 or grappled with the Supreme Court's recent admonitions regarding the presumption against extraterritoriality.

Because § 1114 does not apply extraterritorially, we must vacate the portion of the defendants' convictions based on that statute.

2. 18 U.S.C. § 924(c) renders criminal the use of a firearm "in relation to any crime of violence or drug trafficking crime." All agree that attempted murder under § 1116 qualifies as "a crime of violence" and that the defendants used a firearm. But that in itself isn't enough to establish that *§ 924(c)* applies

overseas—even where its application depends upon a crime of violence that (like § 1116) indisputably applies abroad.

Section 924(c) belongs to a genus of statute that imposes liability only if a defendant commits a predicate crime. In *RJR Nabisco*, the Supreme Court faced a similar scheme established by the Racketeer Influenced and Corrupt Organizations Act ("RICO"). The Court made clear that for RICO to apply to conduct overseas, an absolute minimum is that "the predicates alleged in a particular case themselves apply extraterritorially." As noted, § 1116 satisfies that criterion.

But *RJR Nabisco* insisted on more: affirmative evidence of congressional intent that the umbrella crime itself (RICO there, § 924(c) here) should apply to conduct overseas. The Court found such evidence in RICO's explicit listing of named predicate offenses that each provided explicitly for extraterritorial application, including, for example, 18 U.S.C. § 351(i) (incorporated into RICO by 18 U.S.C. § 1960(1)(G)); 18 U.S.C. § 1957(d)(2) (incorporated into RICO by *id*. § 1961(1)(B)). See *RJR Nabisco*, 136 S. Ct. at 2101–02 (invoking these and similar predicate crimes).

Section 924(c) defines a crime of violence in generic terms as a felony which "has as an element the use, attempted use, or threatened use of physical force against the person or property of another." *Id*. § 924(c)(3)(A). We assume that such incorporation of a mass of crimes of violence, of which we may assume only a handful reflect a congressional intent of application abroad, would not satisfy *RJR Nabisco*. But § 924(c) also includes drug trafficking crimes as predicate offenses (or at least § 924(c)'s analogy to RICO's predicate offenses), see 18 U.S.C. § 924(c)(2), and specifically enumerates 46 U.S.C. § 70503. In the latter, subsection (a) identifies forbidden drug-trafficking conduct and subsection (b) specifies that (a) "applies even though the act is committed

outside the territorial jurisdiction of the United States." Following *RJR Nabisco*, we believe these predicates provide the necessary textual indication that Congress meant § 924(c) to apply overseas "to the extent that the predicates alleged in a particular case themselves apply extraterritorially." 136 S. Ct. at 2101.

Defendants would have us read § 924(c)'s reference to crimes of violence completely separately from the reference to particular drug crimes, so that the link that we have just described above would not satisfy *RJR Nabisco*. But the two segments are very closely linked historically. In § 924(c)'s original form, the statute referenced only crimes of violence as predicates. But courts applying the so-called "categorical" approach to the term concluded that drug trafficking offenses— despite the propensity for violence when committed with a firearm—did not qualify as a violent felony. See generally *United States v. Burris*, 912 F.3d 386, 407 (6th Cir. 2019) (en banc) (Thapar, J., concurring) (collecting criticism of the categorical approach). Rather than have this swath of often violent conduct go under punished, Congress amended the statute to explicitly include enumerated drug trafficking offenses. See *United States v. Davis*, 139 S. Ct. 2319, 2331 (2019) (outlining this history). Given this history, it makes sense to regard § 924(c)'s provisions on crimes of violence and drug trafficking as a package; defendants' effort to wall the crimes of violence off from inferences largely based on the drug trafficking provisions will not wash.

Today's holding that § 924(c) applies extraterritorially where linked to an extraterritorially applying predicate fits with our decision in *United States v. Ali*, 718 F.3d 929 (D.C. Cir. 2013). *Ali* held that the government could not charge a defendant with conspiracy to commit piracy when the conduct occurred overseas, even though the underlying predicate charge of piracy clearly applied to conduct outside the United States.

See *id*. at 942. We started from the broad proposition that "the extraterritorial reach of an ancillary offense like aiding and abetting or conspiracy is coterminous with that of the underlying criminal statute," *id*. at 939, clearly a far broader view than that of *RJR Nabisco*. But we held that this rule did not hold when it came to conspiracy to commit piracy because such conspiracy liability would violate the law of nations, and we presume that Congress legislates with international law in mind. See *id*. at 942.

That presumption, originally set forth in *Murray v. Schooner Charming Betsy*, 6 U.S. (2 Cranch) 64 (1804), and known as the *Charming Betsy* doctrine, is different from the presumption against extraterritoriality. See *Ali*, 718 F.3d at 935. The defendants do not raise a *Charming Betsy* issue in this case, and for good reason: International law's protective principle allows a state to exercise jurisdiction to protect its officials overseas, which § 1116 and (in this case) § 924(c) do. See *Restatement (Third) of Foreign Relations Law* § 402; *Restatement (Fourth) of Foreign Relations Law* § 412. Of course even if defendants had invoked the *Charming Betsy* principle, it is only a presumption, see *Ali*, 718 F.3d at 942, which § 924(c)'s affirmative textual evidence displaces.

3. 18 U.S.C. § 924(j) applies a sentencing enhancement where a defendant commits a § 924(c) violation and "causes the death of a person through the use of a firearm." If the killing "is a murder (as defined in [18 U.S.C. § 1111])," the defendant may "be punished by death or by imprisonment for any term of years or for life." *Id*. § 924(j)(1).

In this case, the defendants wounded one American law enforcement officer, Agent Avila, who qualified for protection under § 1116, and they killed another agent, Agent Zapata, who qualified for protection only under § 1114. The defendants argue that, once we vacate their convictions under § 1114, we

must also vacate the jury's finding that they caused Agent Zapata's death for purposes of § 924(j). We disagree.

Nothing in § 924(j) requires the predicate offense in § 924(c) to also encompass the death in § 924(j). Indeed, someone can receive a § 924(j) enhancement if he commits a drug trafficking predicate for purposes of § 924(c) and an accidental death occurs (via a firearm) that qualifies as manslaughter. See § 924(j)(2) (providing a punishment for manslaughter). This means that a jury can hear evidence about a killing solely for purposes of establishing the elements of § 924(j).

In this case, it's true, the jury also learned about Agent Zapata's death to establish the defendants' liability under § 1114. And the district court judge instructed the jury to make a finding regarding whether the defendants caused Agent Zapata's death only after they found the defendants guilty of murder under § 1114. (It made sense to require the jury to engage in that sequential decision making because § 1114 and § 924(j)(1) incorporate the same definition of murder set forth in § 1111.) But the jury would have heard the same evidence about Agent Zapata's death in the absence of the § 1114 charges, and the same elements of the § 924(j) charge, making harmless any resulting error in their inclusion and the resulting jury instructions. See *Thompson*, 921 F.3d at 269 ("Since no possible prejudice could have arisen from the asserted error, we conclude the error was harmless.").

\* \* \*

The defendants also contest the district court's decision to limit their ability to cross examine a government witness about his prior misconduct. Like the defendants, the witness served as a "sicario," an assassin for the Zeta drug cartel, in which capacity he committed many acts plausibly described by the

defendants as heinous. And like the defendants, the witness participated in the attack on Agents Zapata and Avila.

There is no dispute that evidence of lawlessness can undermine the perpetrator's probable truthfulness, but admission of such evidence is subject to the sound discretion of the trial court. Here the district court prevented the defendant from interrogating the witness regarding his role in a smorgasbord of crimes, including "kidnapping and ordering people shot in the head, burning bodies in barrels of oil, [and] getting into a fire fight with the Mexican army." C.A. 344.

If there was any error in that ruling, we believe it was rendered fully harmless by the broad range of other heinous conduct that the court allowed defense counsel to bring out in cross-examination. Counsel extracted from the witness evidence about three murders he committed, in one of which (defense counsel alleged) the witness took another gang member "to a park to shoot him in the leg, torture him and kill him with a blow to the head with a sword." C.A. 395. And on direct the jury learned that the witness worked as a sicario, led an assassination squad, participated in the attack on Agents Zapata and Avila, committed five carjackings, and kidnapped three men at gunpoint on the very same day as the attack. C.A. 283, 294, 313–20.

That mass of evidence was enough to enable the jury to assess the relation between the witness's lawlessness and his propensity for truthfulness; it thus rendered harmless any error (if any error even occurred).

* * *

Because we vacate the defendants' convictions under § 1114, we remand their cases for a limited resentencing in which the district court may determine whether to modify its

sentence in light of our vacatur.  See *United States v. Blackson*, 709 F.3d 36, 40 (D.C. Cir. 2013).

*So ordered.*