# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued November 19, 2012        Decided June 11, 2013

No. 12-3056

UNITED STATES OF AMERICA,
APPELLANT

v.

ALI MOHAMED ALI, ALSO KNOWN AS AHMED ALI ADAN, ALSO
KNOWN AS ISMAIL ALI,
APPELLEE

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:11-cr-00106-1)

———

*David B. Goodhand*, Assistant U.S. Attorney, argued the cause for appellant. With him on the briefs were *Ronald C. Machen, Jr.*, U.S. Attorney, and *Elizabeth Trosman*, *Brenda J. Johnson*, and *Elizabeth Gabriel*, Assistant U.S. Attorneys. *Peter S. Smith*, Assistant U.S. Attorney, entered an appearance.

*Brian C. Brook* argued the cause for appellee. With him on the brief were *Matthew J. Peed* and *Timothy R. Clinton*.

Before: BROWN, *Circuit Judge*, and EDWARDS and SILBERMAN, *Senior Circuit Judges*.

BROWN, *Circuit Judge*: Ali Mohamed Ali, a Somali national, helped negotiate the ransom of a merchant vessel and its crew after they were captured by marauders in the Gulf of Aden. Though he claims merely to have defused a tense situation, the government believes he was in cahoots with these brigands from the very start. Ali eventually made his way to the United States, where he was arrested and indicted for conspiring to commit and aiding and abetting two offenses: piracy on the high seas and hostage taking.

The government says Ali is a pirate; he protests that he is not. Though a trial will determine whether he is in fact a pirate, the question before us is whether the government's allegations are legally sufficient. And the answer to that question is complicated by a factor the district court deemed critical: Ali's alleged involvement was limited to acts he committed on land and in territorial waters—not upon the high seas. Thus, the district court restricted the charge of aiding and abetting piracy to his conduct on the high seas and dismissed the charge of conspiracy to commit piracy. Eventually, the district court also dismissed the hostage taking charges, concluding that prosecuting him for his acts abroad would violate his right to due process. On appeal, we affirm dismissal of the charge of conspiracy to commit piracy. We reverse, however, the district court's dismissal of the hostage taking charges, as well as its decision to limit the aiding and abetting piracy charge.

## I. BACKGROUND

### A. Modern Piracy

Mention "pirates" to most Americans and you are more likely to evoke Johnny Depp's droll depiction of Captain Jack Sparrow than concern about the international scourge of

piracy that long ago led most civilized states to declare such marauders the enemy of all mankind. In unstable parts of the world, piracy is serious business, and these troubled waters have seen a resurgence in pirate attacks, both successful and attempted. *See, e.g.*, INT'L MAR. ORG., MSC.4/ CIRC.180, REPORTS ON ACTS OF PIRACY AND ARMED ROBBERY AGAINST SHIPS: ANNUAL REPORT – 2011, at 2 (2012); INT'L MAR. ORG., MSC.4/CIRC.169, REPORTS ON ACTS OF PIRACY AND ARMED ROBBERY AGAINST SHIPS: ANNUAL REPORT – 2010, at 2 (2011). Pirate attacks have become increasingly daring, as well as commonplace, with pirates targeting large commercial vessels in transit, hijacking these ships, and ransoming the crews. *See* W. Michael Reisman & Bradley T. Tennis, *Combating Piracy in East Africa*, 35 YALE J. INT'L. L. ONLINE 14, 16–18 (2009). These predatory activities have proven especially lucrative in the Gulf of Aden (situated between the Arabian Peninsula and the Horn of Africa and bounded by a long stretch of Somalia's coast), where pirates can exploit a key trade route undeterred by Somalia's unstable government. *See* Milena Sterio, *The Somali Piracy Problem: A Global Puzzle Necessitating A Global Solution*, 59 AM. U. L. REV. 1449, 1450–51 (2010).

*B. Ali's Offense and Prosecution*[1]

Ali is a member of Somalia's Warsengeli clan,[2] which, together with the Majertein clan, plotted the capture of the

---

[1] The facts are undisputed for the purpose of this appeal, which concerns only the legal sufficiency of the government's case. *See United States v. Lattimore*, 215 F.2d 847, 849, 851 (D.C. Cir. 1954).

[2] According to a previous government filing, Ali's origins are not entirely certain, since he has represented himself on prior occasions sometimes as a Somali national and at other times as a

*CEC Future*, a Danish-owned merchant ship that flew a Bahamian flag and carried cargo owned by a U.S. corporation. On November 7, 2008, while the *CEC Future* was traveling in the Gulf of Aden on the "high seas"—*i.e.*, outside any nation's territorial waters, RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW § 521 cmt. a (1987)—Ali's compatriots launched their attack. Wielding AK-47s and a rocket-propelled grenade, the raiders fired warning shots, boarded the ship, and seized the crew. They then forced crewmembers at gunpoint to reroute the ship to Point Ras Binna, off the coast of Somalia, where, on November 9, Ali came aboard and assumed the role of interpreter. The ship traveled that same day to Eyl, a Somali port, and remained at anchor there until it was ransomed the following January.

Except for a brief period of "minutes" during which the *CEC Future* entered the high seas, the ship traversed exclusively territorial waters while Ali was aboard. Ali promptly began negotiating with the owners of the *CEC Future*, starting with an initial demand of $7 million for the release of the ship, its crew, and its cargo. Discussions continued into January 2009, when Ali and the *CEC Future*'s owners agreed to a $1.7 million ransom. As payment for his assistance, Ali also demanded $100,000 (a figure he later reduced to $75,000) be placed in a personal bank account. On January 14, the pirates received the agreed-upon $1.7 million, and two days later Ali and his cohorts left the ship. Ali's share amounted to $16,500—one percent of the total ransom less expenses. He later received his separate $75,000 payment via wire transfer to the account he had previously specified.

---

Yemeni national. *See* Gov't Mem. & Proffer Supp. Pretrial Detention 5–6.

As it happens, "pirate hostage negotiator" is not the only line on Ali's resume. In June 2010, he was appointed Director General of the Ministry of Education for the Republic of Somaliland, a self-proclaimed sovereign state within Somalia. *United States v. Ali* ("*Ali I*"), 870 F. Supp. 2d 10, 17 (D.D.C. 2012). When he received an email in March 2011 inviting him to attend an education conference in Raleigh, North Carolina, he agreed. *Id.* Little did he know it was all an elaborate ruse. For some time, federal prosecutors had been busy building a case against Ali, charging him via criminal complaint and later obtaining a formal indictment. When Ali landed at Dulles International Airport on April 20, 2011, to attend the sham conference, he was promptly arrested. *Id.*

A grand jury issued a four-count superseding indictment against Ali, charging him first with conspiracy to commit piracy under the law of nations, in violation of 18 U.S.C. § 371, which makes it a crime for "two or more persons" to "conspire . . . to commit any offense against the United States." Invoking aiding and abetting liability under 18 U.S.C. § 2, Count Two charged Ali with committing piracy under the law of nations, in violation of 18 U.S.C. § 1651, which provides, "Whoever, on the high seas, commits the crime of piracy as defined by the law of nations, and is afterwards brought into or found in the United States, shall be imprisoned for life." Counts Three and Four analogously charged Ali with conspiracy to commit hostage taking and aiding and abetting hostage taking, in violation of 18 U.S.C. §§ 1203 and 2. The hostage taking statute prescribes criminal penalties for

> whoever, whether inside or outside the United States, seizes or detains and threatens to kill, to injure, or to continue to detain another person in order to compel a third person or a

governmental organization to do or abstain from doing any act as an explicit or implicit condition for the release of the person detained, or attempts or conspires to do so.

*Id.* § 1203(a).

Ali filed a motion to dismiss the charges as legally defective, meeting with partial success. *See United States v. Ali* ("*Ali II*"), 885 F. Supp. 2d 17, 45–46 (D.D.C. 2012). Beginning with the premise that the definition of piracy under international law does not encompass conspiratorial liability, the district court dismissed Count One in full, concluding § 1651, which defines piracy in terms of "the law of nations," could not ground a conspiracy charge. *See id.* at 33. The court similarly refused to interpret § 371, the federal conspiracy statute, as applying to piracy under the law of nations. So read, the court said, the statute would contravene international law in a way Congress never intended. *See id.* at 33–34. As for Count Two, the court reasoned piracy under § 1651 and international law only concerns acts committed on the high seas and consequently limited Count Two to acts of aiding and abetting Ali committed while *he* was on the high seas. *See id.* at 32. Finally, the district court declined to dismiss Counts Three and Four, ruling that Congress intended whatever conflict exists between international law and extraterritorial application of § 1203, *id.* at 35, and that prosecution for extraterritorial acts of hostage taking satisfied the notice requirements of due process because Ali's piracy offenses already subjected him to the universal jurisdiction of the United States, *id.* at 44–45.

The district court reconsidered Counts Three and Four, however, after learning that the government had no "specific evidence" Ali had facilitated any acts of piracy while outside

territorial waters, and that the *CEC Future* proceeded on the high seas only for a matter of minutes while Ali was aboard. *See United States v. Ali* ("*Ali III*"), 885 F. Supp. 2d 55, 58 (D.D.C. 2012). Due process, the court said, is satisfied only if Ali had some reasonable expectation he could be haled into an American court. So long as the government could establish that he had committed piracy on the high seas—a crime over which all nations may exercise jurisdiction—this expectation was met. But because Ali's criminal conduct took place in territorial waters, he had no notice his actions subjected him to prosecution in the United States for hostage taking. Thus, in light of the government's revelation that it could not show Ali's offenses occurred on the high seas, due process precluded exercising jurisdiction over Counts Three and Four. *Id.* at 62.

The government now challenges the district court's dismissal of Counts One, Three, and Four, as well as limitation of Count Two. We have jurisdiction over this interlocutory appeal because the government challenges an "order of a district court dismissing an indictment . . . as to any one or more counts." 18 U.S.C. § 3731.

## II. THE PIRACY CHARGES

In most cases, the criminal law of the United States does not reach crimes committed by foreign nationals in foreign locations against foreign interests. Two judicial presumptions promote this outcome. The first is the presumption against the extraterritorial effect of statutes: "When a statute gives no clear indication of an extraterritorial application, it has none." *Morrison v. Nat'l Austl. Bank Ltd.*, 130 S. Ct. 2869, 2878 (2010). The second is the judicial presumption that "an act of Congress ought never to be construed to violate the law of nations if any other possible construction remains," *Murray v.*

*Schooner Charming Betsy*, 6 U.S. (2 Cranch) 64, 118 (1804)—the so-called *Charming Betsy* canon. Because international law itself limits a state's authority to apply its laws beyond its borders, *see* RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW §§ 402–03, *Charming Betsy* operates alongside the presumption against extraterritorial effect to check the exercise of U.S. criminal jurisdiction. Neither presumption imposes a substantive limit on Congress's legislative authority, but they do constrain judicial inquiry into a statute's scope.

Piracy, however, is no ordinary offense. The federal piracy statute clearly applies extraterritorially to "[w]hoever, on the high seas, commits the crime of piracy as defined by the law of nations," even though that person is only "afterwards brought into or found in the United States." 18 U.S.C. § 1651. Likewise, through the principle of universal jurisdiction, international law permits states to "define and prescribe punishment for certain offenses recognized by the community of nations as of universal concern." RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW § 404; *see United States v. Yunis*, 924 F.2d 1086, 1091 (D.C. Cir. 1991). And of all such universal crimes, piracy is the oldest and most widely acknowledged. *See, e.g.*, Kenneth C. Randall, *Universal Jurisdiction Under International Law*, 66 TEX. L. REV. 785, 791 (1988). "Because he commits hostilities upon the subjects and property of any or all nations, without any regard to right or duty, or any pretence of public authority," the pirate is "*hostis humani generis*," *United States v. Brig Malek Adhel*, 43 U.S. (2 How.) 210, 232 (1844)—in other words, "an enemy of the human race," *United States v. Smith*, 18 (5 Wheat.) U.S. 153, 161 (1820). Thus, "all nations [may punish] all persons, whether natives or foreigners, who have committed this offence against any persons whatsoever, with whom they are in amity." *Id.* at 162.

Universal jurisdiction is not some idiosyncratic domestic invention but a creature of international law. Unlike the average criminal, a pirate may easily find himself before an American court despite committing his offense on the other side of the globe. Ali's situation is a bit more complicated, though. His indictment contains no straightforward charge of piracy. Rather, the government accuses him of two inchoate offenses relating to piracy: conspiracy to commit piracy and aiding and abetting piracy.

On their face, both ancillary statutes apply generally and without exception: § 2 to "*[w]hoever . . .* aids, abets, counsels, commands, induces or procures" the commission of "an offense against the United States," 18 U.S.C. § 2(a) (emphasis added), and § 371 to persons who "do any act to effect the object of the conspiracy" to "commit *any* offense against the United States," 18 U.S.C. § 371 (emphasis added). But so powerful is the presumption against extraterritorial effect that even such generic language is insufficient rebuttal. *See Small v. United States*, 544 U.S. 388 (2005). That leaves both statutes ambiguous as to their application abroad, requiring us to resort to interpretive canons to guide our analysis.

Given this ambiguity in the extraterritorial scope of the two ancillary statutes, we consider whether applying them to Ali's actions is consistent with international law. Conducting this *Charming Betsy* analysis requires parsing through international treaties, employing interpretive canons, and delving into drafting history. Likewise, because the two ancillary statutes are "not so broad as to expand the extraterritorial reach of the underlying statute," *United States v. Yakou*, 428 F.3d 241, 252 (D.C. Cir. 2005), we also conduct a separate analysis to determine the precise contours of § 1651's extraterritorial scope. Ultimately, Ali's assault on

his conspiracy charge prevails for the same reason the attack on the aiding and abetting charge fails.

## *A. Aiding and Abetting Piracy*

We begin with Ali's charge of aiding and abetting piracy. Aiding and abetting is a theory of criminal liability, not a separate offense, *United States v. Ginyard*, 511 F.3d 203, 211 (D.C. Cir. 2008)—one that allows a defendant who "aids, abets, counsels, commands, induces or procures" commission of a crime to be punished as a principal, 18 U.S.C. § 2(a). "All that is necessary is to show some affirmative participation which at least encourages the principal offender to commit the offense, with all its elements, as proscribed by the statute." *United States v. Raper*, 676 F.2d 841, 850 (D.C. Cir. 1982). From Ali's perspective, it is not enough that acts of piracy were committed on the high seas and that he aided and abetted them. Rather, he believes any acts of aiding and abetting he committed must themselves have occurred in extraterritorial waters and not merely supported the capture of the *CEC Future* on the high seas.

Ali's argument involves two distinct (though closely related) inquiries. First, does the *Charming Betsy* canon pose any obstacle to prosecuting Ali for aiding and abetting piracy? For we assume, absent contrary indication, Congress intends its enactments to comport with international law. Second, is the presumption against extraterritoriality applicable to acts of aiding and abetting piracy not committed on the high seas?

### 1. Piracy and the *Charming Betsy* Canon

Section 1651 criminalizes "the crime of piracy as defined by the law of nations." Correspondence between the domestic and international definitions is essential to exercising

universal jurisdiction. Otherwise, invocation of the magic word "piracy" would confer universal jurisdiction on a nation and vest its actions with the authority of international law. *See* Randall, *supra*, at 795. As a domestic matter, doing so may be perfectly legal. But because *Charming Betsy* counsels against interpreting federal statutes to contravene international law, we must satisfy ourselves that prosecuting Ali for aiding and abetting piracy would be consistent with the law of nations.

Though § 1651's invocation of universal jurisdiction may comport with international law, that does not tell us whether § 2's broad aider and abettor liability covers conduct neither within U.S. territory nor on the high seas. Resolving that difficult question requires examining precisely what conduct constitutes piracy under the law of nations. Luckily, defining piracy is a fairly straightforward exercise. Despite not being a signatory, the United States has recognized, via United Nations Security Council resolution, that the U.N. Convention on the Law of the Sea ("UNCLOS") "sets out the legal framework applicable to combating piracy and armed robbery at sea." S.C. Res. 2020, U.N. Doc. S/Res/2020, at 2 (Nov. 22, 2011); *see United States v. Dire*, 680 F.3d 446, 469 (4th Cir. 2012). According to UNCLOS:

> Piracy consists of any of the following acts:
>
> (a)  any illegal acts of violence or detention, or any act of depredation, committed for private ends by the crew or the passengers of a private ship . . . and directed:
> (i)  on the high seas, against another ship . . . or against persons or property on board such ship . . . ;

> > (ii) against a ship, . . . persons or
> > property in a place outside the
> > jurisdiction of any State;
>
> (b) any act of voluntary participation in the
> operation of a ship . . . with knowledge
> of facts making it a pirate ship . . . ;
>
> (c) any act of inciting or of intentionally
> facilitating an act described in
> subparagraph (a) or (b).

UNCLOS, art. 101, Dec. 10, 1982, 1833 U.N.T.S. 397, 436. By including "intentionally facilitating" a piratical act within its definition of piracy, article 101(c) puts to rest any worry that American notions of aider and abettor liability might fail to respect the international understanding of piracy.[3] One question remains: does international law require facilitative acts take place on the high seas?

Explicit geographical limits—"on the high seas" and "outside the jurisdiction of any state"—govern piratical acts under article 101(a)(i) and (ii). Such language is absent, however, in article 101(c), strongly suggesting a facilitative act need not occur on the high seas so long as its predicate offense has. *Cf. Dean v. United States*, 556 U.S. 568, 573 (2009) ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." (internal quotation marks omitted)). So far, so good; *Charming Betsy* poses no problems.

---

[3] As neither party draws support for its position from article 101(b), we need not opine on its meaning here.

13

Ali endeavors nonetheless to impute a "high seas" requirement to article 101(c) by pointing to UNCLOS article 86, which states, "The provisions of this Part apply to all parts of the sea that are not included in the exclusive economic zone, in the territorial sea or in the internal waters of a State, or in the archipelagic waters of an archipelagic State." 1833 U.N.T.S. at 432. Though, at first glance, the language at issue appears generally applicable, there are several problems with Ali's theory that article 86 imposes a strict high seas requirement on all provisions in Part VII. For one thing, Ali's reading would result in numerous redundancies throughout UNCLOS where, as in article 101(a)(i), the term "high seas" is already used, and interpretations resulting in textual surplusage are typically disfavored. *Cf. Babbitt v. Sweet Home Chapter of Communities for a Great Or.*, 515 U.S. 687, 698 (1995). Similarly, many of the provisions to which article 86 applies explicitly concern conduct outside the high seas. *See, e.g.*, UNCLOS, art. 92(1), 1833 U.N.T.S. at 433 ("A ship may not change its flag during a voyage or while in a port of call . . . ."); *id.* art. 100, 1833 U.N.T.S. at 436 ("All States shall cooperate to the fullest possible extent in the repression of piracy on the high seas or in any other place outside the jurisdiction of any State."). Ali's expansive interpretation of article 86 is simply not plausible.

What does article 86 mean, then, if it imposes no high seas requirement on the other articles in Part VII of UNCLOS? After all, "the canon against surplusage merely favors that interpretation which *avoids* surplusage," not the construction substituting one instance of superfluous language for another. *Freeman v. Quicken Loans, Inc.*, 132 S. Ct. 2034, 2043 (2012). We believe it is best understood as definitional, explicating the term "high seas" for that portion of the treaty most directly discussing such issues. Under this interpretation, article 86 mirrors other prefatory provisions in UNCLOS. Part

II, for example, concerns "Territorial Sea and Contiguous Zone" and so opens with article 2's explanation of the legal status of a State's territorial sea. 1833 U.N.T.S. at 400. And Part III, covering "Straits Used for International Navigation," begins with article 34's clarification of the legal status of straits used for international navigation. 1833 U.N.T.S. at 410. Drawing guidance from these provisions, article 86 makes the most sense as an introduction to Part VII, which is titled "High Seas," and not as a limit on jurisdictional scope. *Cf. FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) ("It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." (internal quotation marks omitted)).

Thwarted by article 101's text, Ali contends that even if facilitative acts count as piracy, a nation's universal jurisdiction over piracy offenses is limited to high seas conduct. In support of this claim, Ali invokes UNCLOS article 105, which reads,

> On the high seas, or in any other place outside the jurisdiction of any State, every State may seize a pirate ship or aircraft, or a ship or aircraft taken by piracy and under the control of pirates and arrest the persons and seize the property on board. The courts of the State which carried out the seizure may decide upon the penalties to be imposed . . . .

1833 U.N.T.S. at 437. Ali understands article 105's preface to govern the actual enforcement of antipiracy law—and, by extension, to restrict universal jurisdiction to the high seas—even if the definition of piracy is more expansive. In fact, Ali gets it backward. Rather than curtailing the categories of

persons who may be prosecuted as pirates, the provision's reference to the high seas highlights the broad authority of nations to apprehend pirates even in international waters. His reading also proves too much, leaving nations incapable of prosecuting even those undisputed pirates they discover within their own borders—a far cry from "universal" jurisdiction. Article 105 is therefore no indication international law limits the liability of aiders and abettors to their conduct on the high seas.

Ali's next effort to exclude his conduct from the international definition of piracy eschews UNCLOS's text in favor of its drafting history—or, rather, its drafting history's drafting history. He points to UNCLOS's origins in article 15 of the 1958 Geneva Convention on the High Seas, which closely parallels the later treaty's article 101. *See* Geneva Convention on the High Seas, art. 15, Apr. 29, 1958, 13 U.S.T. 2312, 450 U.N.T.S. 82. Article 15 was based in large part on a model convention compiled at Harvard Law School by various legal scholars, *see* 2 ILC YEARBOOK 282 (1956), who postulated that "[t]he act of instigation or facilitation is not subjected to the common jurisdiction unless it takes place outside territorial jurisdiction." Joseph W. Bingham et al., *Codification of International Law: Part IV: Piracy*, 26 AM. J. INT'L L. SUPP. 739, 822 (1932). Ali hopes this latter statement is dispositive.

Effectively, Ali would have us ignore UNCLOS's plain meaning in favor of eighty-year-old scholarship that may have influenced a treaty that includes language similar to UNCLOS article 101. This is a bridge too far. Legislative history is an imperfect enough guide when dealing with acts of Congress. *See Conroy v. Aniskoff*, 507 U.S. 511, 519 (1993) (Scalia, J., concurring in the judgment) ("If one were to search for an interpretive technique that, *on the whole*, was more likely to

confuse than to clarify, one could hardly find a more promising candidate than legislative history."). Ali's inferential chain compounds the flaws—and that even assumes a single intent can be divined as easily from the myriad foreign governments that ratified the agreement as from a group of individual legislators. Even were it a more feasible exercise, weighing the relevance of scholarly work that indirectly inspired UNCLOS is not an avenue open to us. Basic principles of treaty interpretation—both domestic and international—direct courts to construe treaties based on their text before resorting to extraneous materials. *See United States v. Alvarez-Machain*, 504 U.S. 655, 663 (1992) ("In construing a treaty, as in construing a statute, we first look to its terms to determine its meaning."); Vienna Convention on the Law of Treaties, art. 32, May 23, 1969, 8 I.L.M. 679, 692, 1155 U.N.T.S. 331, 340. Because international law permits prosecuting acts of aiding and abetting piracy committed while not on the high seas, the *Charming Betsy* canon is no constraint on the scope of Count Two.

## 2. Piracy and the Presumption Against Extraterritorial Effect

Ali next attempts to achieve through the presumption against extraterritoriality what he cannot with *Charming Betsy*. Generally, the extraterritorial reach of an ancillary offense like aiding and abetting or conspiracy is coterminous with that of the underlying criminal statute. *Yakou*, 428 F.3d at 252. And when the underlying criminal statute's extraterritorial reach is unquestionable, the presumption is rebutted with equal force for aiding and abetting. *See United States v. Hill*, 279 F.3d 731, 739 (9th Cir. 2002) ("[A]iding and abetting[] and conspiracy . . . have been deemed to confer extraterritorial jurisdiction to the same extent as the offenses that underlie them."); *see also Yunis*, 924 F.2d at 1091 (analyzing underlying offenses under extraterritoriality canon

but conducting no separate analysis with respect to conspiracy conviction). Ali admits the piracy statute must have some extraterritorial reach—after all, its very terms cover conduct outside U.S. territory—but denies that the extraterritorial scope extends to any conduct that was not itself perpetrated on the high seas.

We note, as an initial matter, that proving a defendant guilty of aiding and abetting does not ordinarily require the government to establish "participation in each substantive and jurisdictional element of the underlying offense." *United States v. Garrett*, 720 F.2d 705, 713 n.4 (D.C. Cir. 1983). A defendant could, for example, aid and abet "travel[ing] in foreign commerce[] for the purpose of engaging in any illicit sexual conduct with another person," 18 U.S.C. § 2423(b), without himself crossing any international border. *Cf. Raper*, 676 F.2d at 850.

Ali's argument appears to be more nuanced. Ali claims the government seeks to use aider and abettor liability to expand the extraterritorial scope of the piracy statute beyond conduct on the high seas. Because § 1651 expressly targets crimes committed on the high seas, he believes Congress intended its extraterritorial effect—and, by extension, that of the aiding and abetting statute—to extend to international waters and no further. And, he claims, our opinion in *United States v. Yakou* supports this proposition by deciding that a foreign national who had renounced his legal permanent resident status could not be prosecuted for aiding and abetting under a statute applicable to "'[a]ny U.S. person, wherever located, and any foreign person located in the United States or otherwise subject to the jurisdiction of the United States.'" 428 F.3d at 243 n.1 (quoting 22 C.F.R. § 129.3(a)). But this language makes clear the intention to limit U.S. criminal jurisdiction to certain categories of persons—a restriction

employing broad aider and abettor liability would have frustrated. *See* 438 F.3d at 252. In other words, *Yakou* spoke to the sort of defendant Congress had in mind, while § 1651's reference to the high seas, in contrast, describes a category of conduct.

Thus, instead of thwarting some clearly expressed Congressional purpose, extending aider and abettor liability to those who facilitate such conduct furthers the goal of deterring piracy on the high seas—even when the facilitator stays close to shore. In fact, *Yakou* distinguished the offense at issue there from those crimes—like piracy—in which "the evil sought to be averted inherently relates to, and indeed requires, persons in certain categories." *Id.* In keeping with that principle, § 1651's high seas language refers to the very feature of piracy that makes it such a threat: that it exists outside the reach of any territorial authority, rendering it both notoriously difficult to police and inimical to international commerce. *See* Eugene Kontorovich, *Implementing* Sosa v. Alvarez-Machain*: What Piracy Reveals About the Limits of the Alien Tort Statute*, 80 NOTRE DAME L. REV. 111, 152–53 (2004). As UNCLOS § 101(c) recognizes, it is self-defeating to prosecute those pirates desperate enough to do the dirty work but immunize the planners, organizers, and negotiators who remain ashore.

Nor does the Supreme Court's recent decision in *Kiobel v. Royal Dutch Petroleum Co.*, 133 S. Ct. 1659 (2013), change the equation. Reiterating that "[w]hen a statute provides for some extraterritorial application, the presumption against extraterritoriality operates to limit that provision to its terms,'" the Court rejected the notion that "because Congress surely intended the [Alien Tort Statute] to provide jurisdiction for actions against pirates, it necessarily anticipated the statute would apply to conduct occurring abroad." *Id.* at 1667

(quoting *Morrison*, 130 S. Ct. at 2883). Ali contends that § 1651's high seas requirement is similarly limiting, and that the presumption against extraterritoriality remains intact as to acts done elsewhere.

Even assuming Ali's analogy to *Kiobel* is valid,[4] he overlooks a crucial fact: § 1651's high seas element is not the only evidence of the statute's extraterritorial reach, for the statute references not only "the high seas" but also "the crime of piracy as defined by the law of nations." As explained already, the law of nations specifically contemplates, within its definition of piracy, facilitative acts undertaken from within a nation's territory. *See supra* Subsection II.A.1. By defining piracy in terms of the law of nations, § 1651 incorporated this extraterritorial application of the international law of piracy and indicates Congress's intent to subject extraterritorial acts like Ali's to prosecution.

Why then does § 1651 mention the high seas at all if "the law of nations," which has its own high seas requirements, is filling in the statute's content? Simply put, doing so fits the international definition of piracy—a concept that encompasses both crimes on the high seas and the acts that facilitate them—into the structure of U.S. criminal law. To be convicted as a principal under § 1651 alone, one must commit piratical acts on the high seas, just as UNCLOS article 101(a)

---

[4] *Kiobel* and its predecessors stated that courts may not infer that all applications or provisions in a statute have extraterritorial effect just because some do. *See, e.g.*, *Morrison*, 130 S. Ct. at 2883; *Microsoft Corp. v. AT&T Corp.*, 550 U.S. 437, 455–56 (2007). These cases do not suggest, as Ali argues, that a statute's application to a particular foreign region cannot rebut the presumption against extraterritoriality as to other unspecified places.

demands. But applying aider and abettor liability to the sorts of facilitative acts proscribed by UNCLOS article 101(c) requires using § 1651 and § 2 in tandem. That is not to say § 1651's high seas requirement plays no role in prosecuting Ali for aiding and abetting piracy, for the government must prove *someone* committed piratical acts while on the high seas. *See Raper*, 676 F.2d at 849. That is an element the government must prove at trial, but not one it must show Ali perpetrated personally.[5]

Of course, § 1651's high seas language could also be read as Congress's decision to narrow the scope of the international definition of piracy to encompass only those actions committed on the high seas. But Ali's preferred interpretation has some problems. Most damningly, to understand § 1651 as a circumscription of the law of nations would *itself* run afoul of *Charming Betsy*, requiring a construction in conflict with international law. Ultimately, we think it most prudent to read the statute the way it tells us to. It is titled "[p]iracy under law of nations," after all.

Like the *Charming Betsy* canon, the presumption against extraterritorial effect does not constrain trying Ali for aiding and abetting piracy. While the offense he aided and abetted must have involved acts of piracy committed on the high seas, his own criminal liability is not contingent on his having facilitated these acts while in international waters himself.

### *B. Conspiracy To Commit Piracy*

---

[5] The "high seas" reference may also be Congress's attempt to expressly rebut the presumption against extraterritoriality as to piracy. *See Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 440 (1989) ("When it desires to do so, Congress knows how to place the high seas within the jurisdictional reach of a statute.").

Though the aiding and abetting statute reaches Ali's conduct, his conspiracy charge is another matter. In many respects conspiracy and aiding and abetting are alike, which would suggest the government's ability to charge Ali with one implies the ability to charge him with both. While conspiracy is a "separate and distinct" offense in the United States, *Pinkerton v. United States*, 328 U.S. 640, 643 (1946), it is also a theory of liability like aiding and abetting; "[a]s long as a substantive offense was done in furtherance of the conspiracy, and was reasonably foreseeable as a necessary or natural consequence of the unlawful agreement, then a conspirator will be held vicariously liable for the offense committed by his or her co-conspirators." *United States v. Moore*, 651 F.3d 30, 80 (D.C. Cir. 2011) (per curiam) (internal quotation marks omitted).

Yet a crucial difference separates the two theories of liability. Because § 371, like § 2, fails to offer concrete evidence of its application abroad, we turn, pursuant to the *Charming Betsy* canon, to international law to help us resolve this ambiguity of meaning. Whereas UNCLOS, by including facilitative acts within article 101's definition of piracy, endorses aider and abettor liability for pirates, the convention is silent on conspiratorial liability. International law provides for limited instances in which nations may prosecute the crimes of foreign nationals committed abroad, and, in invoking universal jurisdiction here, the government predicates its prosecution of Ali on one of those theories. And although neither side disputes the applicability of universal jurisdiction to piracy as defined by the law of nations, UNCLOS's plain language does not include *conspiracy* to commit piracy. *See, e.g.*, Ved P. Nanda, *Maritime Piracy: How Can International Law and Policy Address This Growing Global Menace?*, 39 DENV. J. INT'L L. & POL'Y 177,

181 (2011) ("It should be noted that the [UNCLOS] definition does not refer to either an attempt to commit an act of piracy or to conspiracy relating to such an act, but it does include voluntary participation or facilitation."). The government offers us no reason to believe otherwise, and at any rate, we are mindful that "imposing liability on the basis of a violation of 'international law' or the 'law of nations' or the 'law of war' generally must be based on norms *firmly* grounded in international law." *Hamdan v. United States*, 696 F.3d 1238, 1250 n.10 (D.C. Cir. 2012) (emphasis added). International law does not permit the government's abortive use of universal jurisdiction to charge Ali with conspiracy. Thus, the *Charming Betsy* doctrine, which was no impediment to Ali's aider and abettor liability, cautions against his prosecution for conspiracy.

The government hopes nonetheless to salvage its argument through appeal to § 371's text. Though courts construe statutes, when possible, to accord with international law, Congress has full license to enact laws that supersede it. *See Yunis*, 924 F.2d at 1091. The government suggests Congress intended to do precisely that in § 371, which provides that "[i]f two or more persons conspire . . . to commit any offense against the United States . . . and one or more of such persons do any act to effect the object of the conspiracy," each is subject to criminal liability. Homing in on the phrase "any offense against the United States," the government contends Congress intended the statute to apply to all federal criminal statutes, even when the result conflicts with international law. Yet, as we explained above, if we are to interpret § 371 as supplanting international law, we need stronger evidence than this. Indeed, the Supreme Court recently rejected the notion that similar language of general application successfully rebuts the presumption against extraterritorial effect. *See Kiobel*, 133 S. Ct. at 1665 ("Nor

does the fact that the text reaches '*any* civil action' suggest application to torts committed abroad; it is well established that generic terms like 'any' or 'every' do not rebut the presumption against extraterritoriality.").

Under international law, prosecuting Ali for conspiracy to commit privacy would require the United States to have universal jurisdiction over his offense. And such jurisdiction would only exist if the underlying charge actually falls within UNCLOS's definition of piracy. Because conspiracy, unlike aiding and abetting, is not part of that definition, and because § 371 falls short of expressly rejecting international law, *Charming Betsy* precludes Ali's prosecution for conspiracy to commit piracy. The district court properly dismissed Count One.

## III. THE HOSTAGE TAKING CHARGES

The linguistic impediments that trouble Counts One and Two do not beset the charges for hostage taking under 18 U.S.C. § 1203. The statute's extraterritorial scope is as clear as can be, prescribing punishments against "whoever, whether inside or outside the United States, seizes or detains and threatens to kill, to injure, or to continue to detain another person in order to compel a third person or a governmental organization to do or abstain from doing any act." 18 U.S.C. § 1203(a). We also need not worry about *Charming Betsy*'s implications, as § 1203 unambiguously criminalizes Ali's conduct. Section 1203 likely reflects international law anyway, as it fulfills U.S. treaty obligations under the widely supported International Convention Against the Taking of Hostages, Dec. 17, 1979, 18 I.L.M. 1456, 1316 U.N.T.S. 205. *See United States v. Lin*, 101 F.3d 760, 766 (D.C. Cir. 1996). Nor, as in the case of the federal piracy statute, is there any uncertainty as to the availability of conspiratorial liability,

since the statute applies equally to any person who "attempts or conspires to" commit hostage taking. 18 U.S.C. § 1203(a).

Faced with this reality, Ali has adopted a different strategy when it comes to Counts Three and Four, swapping his statutory arguments for constitutional ones. He relies on the principle embraced by many courts that the Fifth Amendment's guarantee of due process may impose limits on a criminal law's extraterritorial application even when interpretive canons do not. Though this Circuit has yet to speak definitively, *see United States v. Delgado-Garcia*, 374 F.3d 1337, 1341–43 (D.C. Cir. 2004) (explaining that, even if prosecuting the appellants for their extraterritorial conduct would deprive them of due process, the argument had been waived through their unconditional guilty pleas), several other circuits have reasoned that before a federal criminal statute is given extraterritorial effect, due process requires "a sufficient nexus between the defendant and the United States, so that such application would not be arbitrary or fundamentally unfair." *United States v. Davis*, 905 F.2d 245, 248–49 (9th Cir. 1990) (internal citation omitted); *see United States v. Brehm*, 691 F.3d 547, 552 (4th Cir. 2012); *United States v. Ibarguen-Mosquera*, 634 F.3d 1370, 1378–79 (11th Cir. 2011); *United States v. Yousef*, 327 F.3d 56, 111–12 (2d Cir. 2003) (per curiam); *United States v. Cardales*, 168 F.3d 548, 552–53 (1st Cir. 1999).[6] Others have approached the due

---

[6] Some courts have suggested grouping these decisions into two categories: those that "look for real effects or consequences accruing in the United States before they find [a] nexus" and those that "require only that extraterritorial prosecution be neither arbitrary nor fundamentally unfair, and are not concerned with whether a sufficient nexus exists." *United States v. Campbell*, 798 F. Supp. 2d 293, 306–07 (D.D.C. 2011). The distinction may be illusory, with the "nexus" inquiry serving more as a proxy for whether a particular prosecution is unfair. *See id.* at 307. For

process issue in more cautious terms. *See United States v. Suerte*, 291 F.3d 366, 375 (5th Cir. 2002) (assuming, without deciding, the Due Process Clause constrains extraterritorial reach in order to conclude no violation occurred); *United States v. Martinez-Hidalgo*, 993 F.2d 1052, 1056 (3d Cir. 1993) (accord). Likewise, the principle is not without its scholarly critics. *See, e.g.*, Curtis A. Bradley, *Universal Jurisdiction and U.S. Law*, 2001 U. CHI. LEGAL F. 323, 338 ("[I]t may be logically awkward for a defendant to rely on what could be characterized as an extraterritorial application of the U.S. Constitution in an effort to block the extraterritorial application of U.S. law."). We need not decide, however, whether the Constitution limits the extraterritorial exercise of federal criminal jurisdiction. Either way, Ali's prosecution under § 1203 safely satisfies the requirements erected by the Fifth Amendment.[7]

## A. Due Process and Extraterritorial Conduct

In support of his due process argument, Ali cites a panoply of cases concerning personal jurisdiction in the context of civil suits. It is true courts have periodically borrowed the language of personal jurisdiction in discussing the due process constraints on extraterritoriality. But Ali's flawed analogies do not establish actual standards for judicial

---

present purposes, that question is purely academic, as Ali does not tether his argument to a particular version of the due process argument.

[7] Ali has not cited—and we have not found—any case in which extraterritorial application of a federal criminal statute was actually deemed a due process violation. Although that does not mean such a result is beyond the realm of possibility, it does suggest Ali's burden is a heavy one, for he traverses uncharted territory.

inquiry; the law of personal jurisdiction is simply inapposite. *See United States v. Perez Oviedo*, 281 F.3d 400, 403 (3d Cir. 2002). To the extent the nexus requirement serves as a proxy for due process, it addresses the broader concern of ensuring that "a United States court will assert jurisdiction only over a defendant who should reasonably anticipate being haled into court in this country." *United States v. Klimavicius-Viloria*, 144 F.3d 1249, 1257 (9th Cir. 1998) (internal quotation marks omitted). What appears to be the animating principle governing the due process limits of extraterritorial jurisdiction is the idea that "no man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed." *Bouie v. City of Columbia*, 378 U.S. 347, 351 (1964) (internal quotation marks omitted). The "ultimate question" is whether "application of the statute to the defendant [would] be arbitrary or fundamentally unfair." *United States v. Juda*, 46 F.3d 961, 967 (9th Cir. 1995).

*United States v. Shi*, 525 F.3d 709 (9th Cir. 2008), is most on point. *Shi* dealt with a due process challenge to the defendant's prosecution under 18 U.S.C. § 2280, which implements the Convention for the Suppression of Unlawful Acts Against the Safety of Maritime Navigation, Mar. 10, 1988, 27 I.L.M. 672, 1678 U.N.T.S. 222. *See* 525 F.3d at 717–24. Because "the Maritime Safety Convention . . . expressly provides foreign offenders with notice that their conduct will be prosecuted by any state signatory," due process required no specific nexus between the defendant and the United States. *Id.* at 723. In other words, the treaty at issue in *Shi* did what the International Convention Against the Taking of Hostages does here: provide global notice that certain generally condemned acts are subject to prosecution

by any party to the treaty.[8] We agree with the Ninth Circuit that the Due Process Clause demands no more.

That Ali's Counts Three and Four concern hostage taking and not piracy in the technical sense does nothing to alter *Shi*'s logic. The Ninth Circuit did reason that "the acts with which Shi is charged constitute acts of piracy" and "[p]rosecuting piracy was the original rationale for creating universal jurisdiction." *Id.* Yet strictly speaking, Shi was not charged with piracy but with the separate, albeit analogous, offense of violence against maritime navigation. *See* 18 U.S.C. § 2280. And it is the "universal condemnation of the offender's conduct," not some theory of universal jurisdiction, that drove the Ninth Circuit's reasoning. 525 F.3d at 723. That is why the court also cited *Martinez-Hidalgo*, which dealt with narcotics trafficking, *see* 993 F.2d at 1056—an offense not generally understood to be subject to universal jurisdiction, *see* RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW § 404. By that standard, hostage taking is also an offense whose proscription "is a result of universal condemnation of those activities and general interest in cooperating to suppress them, as reflected in widely-accepted

---

[8] Interestingly, *Shi* even offers some insight into our own Circuit's precedent. Citing our opinion in *United States v. Rezaq*, 134 F.3d 1121 (D.C. Cir. 1998), the Ninth Circuit found particularly relevant our decision to apply an aircraft hijacking statute to the defendant "without noting any possible due process concerns." 525 F.3d at 724. Acknowledging that our silence "may have stemmed from any number of reasons," the court found it "important to note that, like § 2280, the statute in *Rezaq* was enacted to implement an international agreement to extradite and to prosecute perpetrators of widely-condemned conduct." *Id. Rezaq* is not squarely analogous, however, since "hijacking of aircraft," like piracy, is a universal jurisdiction offense. *See* 134 F.3d at 1131; RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW § 404.

international agreements and resolutions of international organizations." *Id.* § 404 cmt. a. Regardless, *Shi*'s comparison of § 2280 to piracy was an alternate holding, not a necessary premise to its conclusion that a treaty may provide notice sufficient to satisfy due process—a fact even Ali concedes. *See* Appellee Br. 37.

Ali also complains that though China was a signatory to the relevant international agreement in *Shi*, Somalia is not a party to the International Convention Against the Taking of Hostages,[9] meaning his home nation has not consented to U.S. criminal jurisdiction over its hostage-taking nationals. True, as a matter of *international* law, this case may not be so obvious as those in which "the flag nation has consented to the application of United States law to the defendants." *United States v. Angulo-Hernández*, 565 F.3d 2, 11 (1st Cir. 2009). But Ali mistakes the due process inquiry for the customary international law of jurisdiction. "Whatever merit [these] claims may have as a matter of international law, they cannot prevail before this court. . . . Our duty is to enforce the Constitution, laws, and treaties of the United States, not to conform the law of the land to norms of customary international law." *Yunis*, 924 F.2d at 1091. Whatever due process requires here, the Hostage Taking Convention suffices by "expressly provid[ing] foreign offenders with notice that their conduct will be prosecuted by any state signatory." *Shi*, 525 F.3d at 723. *That* is what *Shi* said. It did not hold that due process depends on the participation of the *defendant's* nation in the agreement.

---

[9] Somalia does not join most other nations in this regard. As of May 28, 2013, the treaty has 39 signatories and 170 parties. *See* United Nations Treaty Collection, International Convention Against the Taking of Hostages, *available at* http://treaties.un.org/Pages/ViewDetails.aspx?mtdsg_no=XVIII-5&chapter=18&lang=en.

Finally, Ali asserts that "[f]or non-citizens acting entirely abroad, a jurisdictional nexus exists when the aim of that activity is to cause harm inside the United States or to U.S. citizens or interests." *United States v. Al Kassar*, 660 F.3d 108, 118 (2d Cir. 2011). In *Al Kassar*, these interests were present because "[t]he defendants' conspiracy was to sell arms to FARC with the understanding that they would be used to kill Americans and destroy U.S. property." *Id.* There is good reason to believe that whatever "nexus" due process might demand is not "jurisdictional" in the proper sense of the term. *See Delgado-Garcia*, 374 F.3d at 1343 ("Appellants' . . . . assertion is a claim that the due process clause limits the substantive reach of the conduct elements of 8 U.S.C. § 1324(a), not a claim that the court lacks the power to bring them to court at all."). But even assuming *Al Kassar*'s characterization is right, the decision only tells us when such a nexus *exists*, not when it is absent. *See New England Power Generators Ass'n v. FERC*, 707 F.3d 364, 370 n.3 (D.C. Cir. 2013) ("'P ⊃ Q' does not mean '¬P ⊃ ¬Q.'"). And in any event, this quote from *Al Kassar* cannot sustain the expansive construction Ali accords it. Otherwise, the Fifth Amendment would preclude prosecution even of universal jurisdiction offenses like piracy.

*Al Kassar* also states, "Fair warning does not require that the defendants understand that they could be subject to criminal prosecution *in the United States* so long as they would reasonably understand that their conduct was criminal and would subject them to prosecution somewhere." 660 F.3d at 119. Other courts have made similar statements. *See, e.g.*, *Martinez-Hidalgo*, 993 F.2d at 1056 ("Inasmuch as the trafficking of narcotics is condemned universally by law-abiding nations, we see no reason to conclude that it is 'fundamentally unfair' for Congress to provide for the

punishment of persons apprehended with narcotics on the high seas."). While Ali protests that the Second Circuit cannot have meant what it said, the consequence of a literal reading is not the limitless prosecutorial power he envisions. Given presumptions like the *Charming Betsy* and extraterritoriality canons, conduct abroad would only be subject to statutes with clear foreign scope (like § 1203). In fact, since it is those canons and not the Fifth Amendment that have thus far restrained such prosecutorial abuse, Ali's claim that the government's position somehow vitiates essential protections seems dubious.

Lastly, we mention that the district court initially denied dismissal of Counts Three and Four. *See Ali II*, 885 F. Supp. 2d at 45 ("Because the hostage taking charges allege the same high-seas conduct for which Ali is lawfully subject to prosecution for piracy, and in light of the notice that the Hostage Taking Convention provides, the Court concludes that there is nothing fundamentally unfair about Ali's prosecution under § 1203."). It was only once the district court doubted the government's ability to prove either piracy count that it decided haling Ali into a U.S. court to answer charges of hostage taking would violate due process. *See Ali III*, 885 F. Supp. 2d at 61–62. Since we have reversed the district court's decision narrowing the scope of Count Two, the logic of *Ali II*, which allowed Ali's charges for hostage taking to proceed, is once again applicable.

## B. Miscellaneous Due Process Arguments

For his final salvo, Ali fires a barrage of "Special Criminal Law Concerns" he claims are relevant to his right to due process. We respond in kind:

- Ali laments the "lack of vicinage" between his alleged crime and the legal forum set for his prosecution. *See United States v. Cores*, 356 U.S. 405, 407 (1958) ("The provision for trial in the vicinity of the crime is a safeguard against the unfairness and hardship involved when an accused is prosecuted in a remote place."). But Counts Three and Four introduce no unique detriment to Ali's defense beyond that already inherent to his piracy prosecution. And the sweep of Ali's argument is overinclusive, as it would seemingly defeat all extraterritorial applications of criminal statutes.

- Ali next targets the length of his pretrial detention. While he is correct that excessive pretrial detention may in certain circumstances deprive a defendant of his right to a speedy trial, "courts must still engage in a difficult and sensitive balancing process." *Barker v. Wingo*, 407 U.S. 514, 533 (1972). Beyond stating the length of his detention, Ali has offered no specifics on how his rights have been violated or his defense prejudiced.

- Invoking double jeopardy norms, Ali contends his susceptibility to future prosecution in, say, Denmark or Somalia renders inappropriate his prosecution in the United States. Though he acknowledges the Fifth Amendment's prohibition on double jeopardy does not constrain prosecutions by separate sovereigns, *see United States v. Rashed*, 234 F.3d 1280, 1282 (D.C. Cir. 2000), he nonetheless tries to smuggle in the underlying principle via the Due Process Clause. To invoke the principle of double jeopardy in order to thwart a well-recognized exception to the Double Jeopardy Clause is already strange. Yet even more mystifying is his attempt to make the point in the first forum to subject him to criminal charges. It seems such an argument would be more

compelling in the *next* forum (if any) that opts to prosecute him.

Along with these due process concerns, Ali discusses principles of international comity. The issue, as well as its import for due process, is addressed in cursory fashion. No matter. An amorphous reference to international comity is no basis for gainsaying the clearly expressed intention of the United States, by both treaty and statute, to prosecute hostage takers for their offenses abroad.

## IV. CONCLUSION

We affirm the district court's dismissal of Count One. We reverse the district court's narrowing of the scope of Count Two to acts Ali performed while on the high seas and reverse dismissal of Counts Three and Four.

*So ordered.*